826 A.2d 831

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Arthur BOMAR, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2001.

Decided May 30, 2003.

Reargument Denied July 17, 2003.

430

438

Steven C. Leach, Drexel Hill, for Appellant, Arthur Bomar.

William R. Toal, Media, Amy Zapp, Harrisburg, for Appellee, Com. of PA.

Before: FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

JUSTICE CASTILLE.

On October 1, 1998, a jury sitting in the Court of Common Pleas of Delaware County convicted appellant of first-degree

murder,[1] rape,[2] aggravated assault,[3] kidnapping,[4] and abuse of corpse [5] in connection with the killing of Aimee Willard. At the penalty hearing, the jury found three aggravating circumstances: the killing was committed during the perpetration of a felony,[6] the defendant has a significant history of felony convictions involving the use or threat of violence to the person,[7] and the defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.[8] The jury found one mitigating circumstance: any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.[9] The jury determined that the aggravating circumstances outweighed the mitigating circumstance and accordingly returned a sentence of death.[10] On December 4, 1998, the trial court formally imposed the death sentence. In addition, the trial court ruled that appellant was a high-risk, dangerous offender pursuant to the then-governing provisions of 42 Pa.C.S. § 9714. Accordingly, the trial court sentenced appellant to consecutive terms of 10 to 20 years' imprisonment on the rape conviction and 10 to 20 years' imprisonment on the kidnapping conviction. The trial court also sentenced appellant to 1 to 2 years' consecutive imprisonment on the abuse of corpse conviction.[11]

Trial counsel subsequently withdrew from the case and present counsel entered the matter and filed post-sentence motions on appellant's behalf, including claims that trial coun-

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 3121(a).

3. 18 Pa.C.S. § 2702(a).

4. 18 Pa.C.S. § 2901(a).

5. 18 Pa.C.S. § 5510.

6. 42 Pa.C.S. § 9711(d)(6).

7. 42 Pa.C.S. § 9711(d)(9).

8. 42 Pa.C.S. § 9711(d)(11).

9. 42 Pa.C.S. § 9711(e)(8).

10. 42 Pa.C.S. § 9711(c)(1)(iv).

11. No sentence was imposed on the aggravated assault conviction due to merger principles.

sel was ineffective. Following hearings on these motions on March 4, 1999, and April 20, 1999, the trial court denied post-sentence relief. This direct appeal followed. For the reasons set forth below, we affirm the judgment of sentence of death. However, we vacate the judgments of sentence for rape, kidnapping and abuse of corpse and remand for resentencing as to these convictions.

## I. Sufficiency of the Evidence

Although appellant has not challenged the sufficiency of the evidence underlying his first-degree murder conviction, this Court performs a self-imposed duty to review the sufficiency of that evidence in capital cases. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In reviewing the sufficiency of the evidence, the Court must determine whether the evidence admitted at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000) (citing *Commonwealth v. Rhodes*, 510 Pa. 537, 510 A.2d 1217, 1218 (1986)). "Evidence is sufficient to sustain a conviction of first-degree murder where the Commonwealth establishes that the defendant acted with the specific intent to kill, that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done with premeditation or deliberation." *Spotz*, 759 A.2d at 1283 (citing 18 Pa.C.S. § 2502(d) and *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624, 626 (1991)). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 267 (2000).

The evidence presented at trial established the following: At approximately 10:30 p.m. on the evening of June 19, 1996, the victim, 22–year–old Aimee Willard, met several of her high school friends at a bar located on Lancaster Avenue in Wayne,

Pennsylvania. Later that night, at approximately 1:25 a.m., Ms. Willard left the bar alone. She would not make it home.

At approximately 2:00 a.m., on June 20, 1996, the victim's car, a blue Honda Civic, was discovered on the southbound off-ramp of the Springfield–Lima Exit of Interstate 476 in Delaware County. The car's engine was still running, the driver's side door was open, the radio was playing and the interior lights and headlights were on. There was a rough abrasion on the back bumper of the victim's car. There was a pool of blood on the ground in front of the vehicle with drops of blood leading away from it. A tire iron was located near the pool of blood. Later that morning, police discovered a pair of sneakers and a pair of female underpants with a sanitary pad near the abandoned car. The sneakers were later identified as belonging to the victim and the underpants were later identified as the size worn by the victim. Hairs found on the sanitary pad were consistent with the pubic hairs of the victim. The police also obtained tire impressions from the scene.

At approximately 5:00 p.m., on June 20, 1996, Aimee Willard's body was found naked, positioned face down, with two plastic bags covering her head, in a vacant lot at 16th Street and Indiana Avenue in Philadelphia. The victim's injuries included multiple blunt force injuries to her head, brain and face; an abraded contusion on her left shoulder and upper chest; a rectangular shaped contusion beneath her left breast; a patterned, angular thermal injury resembling a flower petal on her right lower chest and upper abdomen; numerous fractures in her neck; bruises on her left and right thighs; and defensive wounds on her left and right forearms. There was intact degenerate sperm found in the victim's vaginal cavity. In addition, a tree branch had been forced into her vagina. There was no blood surrounding or beneath the body or leading up to or away from the body, indicating that the victim was not killed at the site but rather had been killed elsewhere and then moved to this location.

Several hours after the discovery of Aimee Willard's body, at approximately 11:25 p.m., on June 20, 1996, appellant was coincidentally stopped by the police at the intersection of 20th

Street and Erie Avenue in Philadelphia, eight blocks from where the victim's body had been found. Appellant was driving a green 1993 Ford Escort. The police did not arrest appellant at that time.

Nearly a year later, on June 5, 1997, appellant was arrested in Ardmore, Pennsylvania, on an outstanding warrant for violating his parole from a conviction for second degree murder that occurred in Las Vegas, Nevada, and for an unrelated criminal trespass. That evening, investigators from the Delaware County Criminal Investigation Division (CID) questioned appellant concerning the Willard murder. Appellant told the investigators, among other things, that he drove a 1993 Ford Escort until March of 1997, that he had been to the same bar that the victim had been to on the night of June 19, 1996, previously with a former girlfriend, and that he routinely traveled on Interstate 476.

On July 10, 1997, two Pennsylvania State Police troopers met with appellant's then-girlfriend, Mary Rumer. Rumer told the troopers that appellant had confessed to her that he murdered Aimee Willard. She told police that appellant related the following events to her: Appellant observed Aimee leave the bar, get into her car, and begin to drive away. He followed in his own car. Appellant stopped Aimee's car on Interstate 476 and flashed a fake police badge. When Aimee asked why she was being stopped, appellant told her that she was swerving on the road. Aimee then became angry, at which point appellant punched her, knocking her unconscious. After placing the victim in his car, appellant drove to an abandoned building. Appellant took the victim's clothes, placed them in a trash bag and threw them away. Appellant hit the victim's head with a hard object and killed her. He also admitted raping the victim to Rumer.

Rumer also told the troopers that appellant had shown her the location on Interstate 476 where Aimee Willard's car was abandoned as well as the vacant lot where her body was recovered.

On July 11, 1997, the police conducted a search of appellant's 1993 Ford Escort pursuant to a search warrant. The police seized and removed the following articles: the left front tire of the vehicle, a Firestone FR440 P17570R13; the oil pan from the undercarriage of the vehicle; and the right front door panel, which contained several brownish spots that later tested positive for blood. The tire taken from appellant's car was consistent in tread design, size, and wear pattern with the tire impressions taken from the area where the victim's car was found abandoned. The repeating cross-rectangle shape features, the vertical lines, and the machined edge present on the oil pan taken from appellant's vehicle matched the pattern injury on the right side of the victim's body. Most significantly, deoxyribonucleic acid ("DNA") testing of the bloodstains on the door panel indicated that Aimee Willard was a contributor to the stains.

On July 13, 1997, the police executed a search warrant for samples of appellant's blood. DNA testing of the blood samples established that appellant's DNA profile matched the DNA profile of the male fraction developed from vaginal swabs taken from Aimee Willard. There was but a one in 500 million chance that someone other than appellant was the source of the genetic material taken from the victim.

Also in July of 1997, David O'Donald, appellant's ex-brother-in-law, who was incarcerated in a federal prison for unrelated offenses, met with law enforcement officials to offer his assistance in the ongoing investigation of appellant's involvement in the Willard murder. Pursuant to those discussions, O'Donald was transferred to the Montgomery County Correctional Facility where appellant was being held. O'Donald was placed on the same cellblock as appellant for approximately two weeks in July. On July 17, 1997, while appellant was in O'Donald's cell, appellant told him, "if I had disposed of the body, there would be no problem," and "no body, no Grand Jury indictment." In addition, appellant stated that, "if everyone does what I tell them, I'll be alright." Later that day, while O'Donald was in appellant's cell, appellant stated, "I grabbed the bitch and she said please don't do this." He told

O'Donald that he then said to the victim, "I'll do whatever the fuck I want, just shut up," to which she replied, "just don't kill me, I'll do anything." Appellant told O'Donald that at that point, "we did whatever we wanted with her, she did whatever we told, and when we were done, I almost took her head off, and we crammed a tree branch up her cunt."

The foregoing physical, confessional, scientific and circumstantial evidence overwhelmingly supports the jury's finding that Aimee Willard was unlawfully killed, that appellant is the person who committed this slaying, that he acted with specific intent to kill, and that the killing was done with premeditation and deliberation.

## II. Trial Court Error

Appellant alleges a total of eight claims of trial court error. Appellant's first three such claims allege that the trial court erred in denying his pre-trial motion to suppress statements he made to the police on June 5, 1997, July 17, 1997, and October 15, 1997. Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Fletcher,* 750 A.2d at 268 (citing *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 197 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998)). Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

Appellant first claims that the trial court erred in declining to suppress his statements to law enforcement officials on June 5, 1997. Appellant contends that while Sergeant J. Mark Keenan, the first officer who questioned him on June 5, was in

▬▬▬▬ .

the process of advising appellant of his *Miranda* rights [12] prior to commencing his interrogation, appellant interrupted the Sergeant and invoked his Fifth Amendment right to have counsel present during custodial interrogation. In addition, appellant asserts that he never explicitly waived his rights. Accordingly, appellant contends that his subsequent statements to Sergeant Keenan, as well as the statements he made later in the day to detectives from the Philadelphia Police Department investigating the unrelated disappearance of Marie Cabuenos, and additional statements he made to Delaware County investigators regarding the Willard murder, should all have been suppressed. No relief is due.

▬▬▬ Sergeant Keenan testified at the suppression hearing that appellant interrupted his recitation of the *Miranda* warnings, not to invoke his right to counsel, but rather to inform the Sergeant that he understood his rights and that he did not need to continue with the warnings. The Sergeant further testified that he informed appellant that, regardless of whether appellant was aware of his constitutional rights, he nonetheless had to advise him of his complete *Miranda* rights and that he then proceeded to recite the warnings in their entirety from the beginning. Sergeant Keenan testified that he asked appellant if he understood the warnings and appellant answered that he did, at which point Sergeant Keenan began to question appellant concerning the criminal trespass then under investigation. The Sergeant testified that appellant never declined to speak with him after being advised of his *Miranda* warnings and that he never requested an attorney. The trial court found Sergeant Keenan's testimony to be credible and accorded it great weight. *See* Trial Court slip op. at 21. This Court must defer to the credibility determinations of the trial court which had the opportunity to observe the demeanor of Sergeant Keenan and heard him testify. *Commonwealth v. McCracken*, 540 Pa. 541, 659 A.2d 541, 546

12. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (prior to custodial interrogation, suspect must be advised that he has right to remain silent, that anything he says can be used against him in court of law, that he has right to presence of counsel, and that if he cannot afford counsel one will be appointed to him).

(1995). Accordingly, there is ample evidence in the record to support the trial court's finding that appellant did not invoke his Fifth Amendment right to counsel, and that determination will not be disturbed on appeal.

Further, although appellant did not make an explicit statement of waiver after being advised of his *Miranda* rights, such a statement is not necessary to a finding of waiver under the Fifth Amendment. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The pertinent question is "whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* "Waiver can be clearly inferred from the actions and words of the person interrogated." *Id.* As noted above, appellant twice clearly indicated that he understood his *Miranda* rights: once while Sergeant Keenan was partway through the *Miranda* warnings, and a second time after the Sergeant had completed reading the warnings in their entirety. Immediately afterwards, Sergeant Keenan posed a series of questions to appellant during the course of the same dialogue, which appellant answered. At no point during the interrogation did appellant express a desire to terminate the questioning or have an attorney present. In light of the facts of record that appellant twice expressed his understanding of the *Miranda* rights, freely answered the questions posed to him immediately thereafter, and at no point indicated his unwillingness to participate in the interrogation without an attorney present, the record supports the trial court's finding that appellant knowingly and voluntarily waived his *Miranda* rights.[13] Accordingly, the trial court properly declined to suppress appellant's June 5th statements.

---

**13.** In *Commonwealth v. Bussey*, 486 Pa. 221, 404 A.2d 1309 (1979), a three-Justice plurality of this Court would have rejected the implicit waiver rule set forth by the United States Supreme Court in *Butler*, opining instead that, as a matter of state constitutional law, an explicit waiver of *Miranda* is required. Appellant does not cite *Bussey* or otherwise raise a claim under the Pennsylvania Constitution. Accordingly, the question of whether appellant waived his *Miranda* rights for purposes of the Pennsylvania Constitution is not before us. *See Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537, 538 n. 1 (1986) (where claim is made only under United States Constitution, Court will not *sua*

 Appellant next alleges that the trial court erred in failing to suppress the statements he made to David O'Donald on July 17, 1997, while both men were incarcerated at the Montgomery County Correctional Facility. Appellant concedes, as he must, that the police's use of O'Donald to obtain incriminating statements from him did not violate his right to counsel under the Sixth Amendment of the United States Constitution because this right is offense-specific and does not attach until the initiation of adversarial judicial proceedings, and appellant was not arrested for the Willard murder until December 10, 1997. *See United States v. Gouveia*, 467 U.S.

*sponte* address state constitutional question). In any event, we are satisfied that there was no state constitutional violation here. Because *Bussey* was not a majority opinion, it is not a binding precedent. *See Hoy v. Angelone*, 554 Pa. 134, 720 A.2d 745, 750 (1998) (plurality decision lacks precedential value). *See also Interest of O.A.*, 552 Pa. 666, 717 A.2d 490, 496 n. 4 (1998) (opinion announcing judgment of the court) ("While the ultimate order of a plurality opinion, *i.e.* an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority"). In addition, this Court found that a very similar interrogation procedure did not violate the Pennsylvania Constitution in the case of *Commonwealth v. Hughes*, 536 Pa. 355, 639 A.2d 763 (1994). In *Hughes*, the appellant was read his *Miranda* rights from a standard police interrogation card and he orally indicated that he understood each right. The police then asked Hughes whether he wished to give up these rights and talk with the officers. Hughes responded that he did not know what this was all about. The police then informed him that they were investigating a double murder and robbery and proceeded to question him regarding these crimes. Hughes answered the questions and his statements were admitted at his trial. On appeal, Hughes alleged that because he did not expressly waive his *Miranda* rights prior to the officers' interrogation, his statements should have been suppressed under the Pennsylvania Constitution. This Court held that Hughes' rights under the Pennsylvania Constitution were not violated. Writing for a unanimous Court, Justice (now Chief Justice) Cappy reasoned as follows:

> Appellant by his actions, clearly manifested an intent to waive his rights at the time that these allegedly incriminating statements were made.... [H]e clearly and unequivocally indicated after each right was read to him that he understood. And, while he did not directly answer the question as to whether he wished to waive those rights and speak with the officers, he did continue to manifest his understanding of those rights.

*Hughes*, 639 A.2d at 770. *Sub judice*, appellant, in twice stating that he understood his *Miranda* rights and then answering the questions immediately posed to him by Sergeant Keenan, similarly manifested the intent to waive his rights.

180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984) (right to counsel does not attach until initiation of adversarial judicial proceedings). Appellant contends, however, that the July 17th statements were obtained in contravention of his state constitutional right to counsel under Article I, Section 9 of the Pennsylvania Constitution. As the Commonwealth notes, however, the right to counsel under Article I, Section 9, is coterminous with the Sixth Amendment right to counsel, at least for purposes of determining when the right attaches. *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999). Since appellant had no Sixth Amendment right to counsel at the time he made his incriminating statements to O'Donald concerning the Willard murder, he also necessarily had no Article I, Section 9 right to counsel at this point. Accordingly, this claim fails.

Appellant also claims that the suppression court erred in failing to suppress the statements he made to police on October 15, 1997. The relevant facts concerning these statements, as determined by the suppression court, are as follows: On October 14, 1997, a judge of the Delaware County Court of Common Pleas ordered the Superintendent of SCI–Camp Hill, the prison where appellant was incarcerated, to release appellant to the custody of CID Detectives John Easton and Joseph O'Berg the following day for transportation to the offices of the CID for the purpose of a "hearing." On the morning of October 15, 1997, Detectives Easton and O'Berg and Trooper Tedescung Bandy of the Pennsylvania State Police arrived at Camp Hill to transport appellant. Appellant was informed that the reason he was being taken to Delaware County was so that he could be questioned concerning the Willard murder. Appellant agreed to accompany the police. Upon appellant's arrival at the CID offices, Chief John McKenna of the CID orally advised appellant of the *Miranda* warnings. Appellant orally indicated that he understood each right. When he was asked whether, knowing these rights, he was willing to discuss what he knew about the Willard murder, he replied that he was, and that he wanted to clear his name. Appellant answered the officers' questions until he was asked whether he

ever had sexual intercourse with Aimee Willard. At that point, appellant became upset and stated that he was not going to answer the question. The trial court suppressed this response and the statements made by appellant after the invocation of rights. Appellant's statements to the police prior to the invocation, however, were admitted into evidence. *See* Trial Court slip op. at 25–26.

Appellant challenges the admission of those statements which were admitted on two grounds. First, appellant argues that the procedure employed by law enforcement officials to secure his transfer to the CID offices for questioning violated his rights under the Fourth Amendment. Appellant asserts that members of the CID had previously attempted to question him while he was incarcerated at the Montgomery County Prison. Appellant, however, refused to meet with them and became agitated and indicated that he would prefer to spend time in 24–hour lockup rather than meet with the detectives. Appellant asserts that the CID investigators concluded that he had to be removed from prison in order for them to have any chance of obtaining inculpatory statements from him. Accordingly, he contends that the Commonwealth falsely represented to the trial court that appellant's presence was required at a hearing—when, in fact, no hearing was scheduled—to obtain an order authorizing appellant's release to the custody of CID detectives. Appellant asserts that "[t]his is the type of offensive governmental action that the Fourth Amendment was directed against and the exclusionary doctrine designed to deter." Brief of Appellant at 15–16. This claim fails.

There is no doubt that the "bring-down" order authorizing the transfer of appellant to the CID offices was erroneous, since it indicated that appellant was to be removed for a hearing, when no hearing was scheduled. *See* Trial Court slip op. at 26. Appellant, however, does not cite to any record evidence, nor have we identified any, supporting his assertion that the error in the order was the result of false representations or other intentional wrongdoing on the part of the Commonwealth. In fact, at the suppression hearing, the prosecution characterized the error in the court's order as a

"mistake" or "oversight." N.T. 07/24/1998 at 86–87. When offered the opportunity to dispute this assertion, appellant declined. *See id.* at 87–88.

▮▮▮▮ In any event, the transfer of appellant from the Camp Hill Prison to the CID offices in Delaware County did not implicate appellant's rights under the Fourth Amendment. At the time appellant was moved to Delaware County, he was already a prisoner serving time on unrelated charges; he was already unquestionably "seized" for purposes of the Fourth Amendment. The only change in appellant's status that occurred on October 15th was the location of his custody. The transfer from jail to the CID offices in Delaware County did not constitute a separate seizure of appellant under the Fourth Amendment for the obvious reason that he was already lawfully in custody. *See Commonwealth v. Watkins,* 750 A.2d 308 (Pa.Super.2000) (transfer of defendant from jail where he was serving time for drug offense to police station for questioning concerning unrelated homicide did not implicate rights under Fourth Amendment). Furthermore, appellant was not misled regarding the true purpose of his transfer. The police specifically informed appellant that they would be transporting him to the CID offices to discuss the Willard murder and appellant expressly agreed to go with them. Moreover, we are aware of no decision, and certainly appellant cites none, for the proposition that procedural irregularities in the transfer of a prisoner may be the basis for suppressing an otherwise lawful confession on Fourth Amendment grounds. Indeed, the notion of offensive or outrageous governmental conduct, not involving a seizure, sounds under due process, not the Fourth Amendment.

▮▮▮ Second, appellant contends that his October 15 statements should have been suppressed because he did not knowingly and voluntarily waive his *Miranda* rights prior to answering the police questions. *See Fletcher,* 750 A.2d at 280 (Commonwealth bears burden of establishing knowing and voluntary waiver of *Miranda* rights). As discussed above, however, the trial court found that appellant was informed of

his *Miranda* rights and that he expressly indicated that he understood these rights and that he nonetheless wished to speak with the police regarding the Willard murder in order to clear his name. These findings of fact are supported by the record, in particular the testimony of Sergeant McKenna and Officer Bandy, who were present at the interrogation. Thus, they may not be disturbed on appeal. *See Fletcher,* 750 A.2d at 268. Further, the fact that appellant subsequently exercised his right to remain silent indicates that appellant fully understood his *Miranda* rights, and that he knowingly and voluntarily waived these rights. Accordingly, the trial court did not err in declining to suppress appellant's October 15th statements.

■ Appellant's fourth assignment of error is that he was unconstitutionally prohibited from "life qualifying" the jury during *voir dire.* The term "life qualification" refers to the process in which prospective jurors who have a fixed opinion that a sentence of death should always be imposed for a conviction of first-degree murder are identified and excluded from the jury. *Commonwealth v. Keaton,* 556 Pa. 442, 729 A.2d 529, 543 n. 9 (1999). There is no constitutional requirement that each prospective juror be life qualified. *Id.* at 543. If the defendant wishes to life qualify any or all venirepersons, however, the *voir dire* procedure must include such an inquiry. *Morgan v. Illinois,* 504 U.S. 719, 733–34, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). *Accord Keaton,* 729 A.2d at 543.

■ The trial court here specifically queried each of the jurors ultimately seated for appellant's trial whether they would automatically impose the death penalty simply because a defendant had been convicted of first-degree murder, and each juror answered that he or she would not automatically impose the death penalty in this instance. *See* N.T. 9/14/1998 at 215–16, 236–38, 256–58, 266–67, 306; N.T. 9/15/1998 at 320–21, 374, 401–02, 500–01, 512–13; N.T. 9/16/1998 at 620–21, 674–75, 706–07, 720–21, 773–74, 817–18, 845–46, 858.[14] Appellant

14. Although not phrased identically in each instance, the following question posed to one of the jurors is representative:

nonetheless contends that his ability to life qualify the jury was denied because he was restricted from questioning potential jurors about specific aggravating circumstances which might cause them to impose a death sentence and specific mitigating circumstances which might cause them to return a sentence of life imprisonment. As the Commonwealth notes, however, appellant fails to identify a single instance when he attempted to question a prospective juror regarding the potential aggravating circumstances in his case or any instance where he was prevented from doing so by the trial court. It is not the obligation of this Court to pore over the lengthy record of *voir dire* and identify specific instances in the record that may support appellant's generic, unsubstantiated claim that he was denied the opportunity to question prospective jurors with respect to their views of certain aggravating circumstances. Absent any demonstration by appellant that he was in fact denied the opportunity to question prospective jurors regarding specific aggravating circumstances, appellant is clearly not entitled to relief on this aspect of his claim. *See Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 235 (1995) (rejecting claim that prosecutor improperly commented on appellant's credibility at trial where appellant cited to 21 pages of cross-examination to prove claim, but failed to specifically identify which statements were improper and why).

Notwithstanding the above, appellant does identify three occasions where he alleges that he was denied the opportunity to question prospective jurors concerning specific potential mitigating circumstances. Appellant cites to the following exchange during his *voir dire* examination of juror number 8:

**Counsel:** If you were chosen as a juror in this case would you want to hear or would you consider evidence of the defendant's childhood as supported by the facts?

[U]nderstanding that the law does not permit it, would you refuse to follow the law and vote to impose the death penalty just because a defendant's been convicted of first-degree murder, or would you follow the law and vote to impose the death penalty only if you believe the law permitted it and you believe the evidence warranted it?

N.T. 9/14/1998 at 215–16.

**Prosecutor:** Objection.

**The Court:** Sustained. This would be the mitigating. I've ruled on that.

**Counsel:** Oh, okay. I don't have any other questions.

N.T. 9/14/1998 at 201–02. In addition, appellant makes reference to the following additional exchange which took place during the examination of juror number 9:

**Counsel:** Are there circumstances, the judge talked about mitigating circumstances and aggravating circumstances, are there, some mitigating circumstances may be presented by the defense. That would include the defendant's character or the defendant's record, the defendant's good deeds. Would these types of circumstances be considered by you? Would they be considered by you or would you consider them irrelevant if you had to make a decision?

**Prosecutor:** I object, your Honor.

**The Court:** The objection is sustained as asked. You can't ask him what his conclusion's going to be under a set of circumstances that don't yet exist.

**Counsel:** Your honor. I simply want to find out if these types of circumstances would be considered irrelevant by the juror.

**The Court:** Well, I think you need to ask him in the right context. And let me add to what your question is. If you need to supplement it, you may.

If the law told you, I told you, that the law said, look, these are the mitigating circumstances that you may consider if you believe evidence is presented. Would you fail to follow the law and at least consider I told you was to be considered by you?

**Juror Number 9:** Yes, sir, if it was presented in evidence and it was for our consideration, I would consider it, yes.

**Counsel:** Okay. Thank you. I have no other questions.

N.T. 9/14/1998 at 209–10. Finally, appellant cites to the following exchange during the *voir dire* examination of juror number 13:

**Counsel:** Okay. Would you consider circumstances about the Defendant, if it came to a situation where we're in a sentencing hearing, would you consider, would you be able to consider circumstances about the Defendant if the judge instructed you to listen to those circumstances.

**Juror Number 13:** Could you repeat that?

**Counsel:** Sure. Would you be able to consider circumstances about the Defendant in a sentencing hearing if the judge instructed you to consider those circumstances?

Are there any circumstances that you would not be able to consider.

**The Court:** I think we've got two questions now.

**Counsel:** Are there any circumstances about the Defendant, any defendant, in a sentencing hearing that you would find irrelevant or would not consider?

**Prosecutor:** Objection, your Honor.

**The Court:** Sustained.

**Counsel:** Despite the judge instructing you to consider that?

**Prosecutor:** Objection.

**The Court:** Well, the first question, the objection has been sustained so there's nothing to tag the end line. Let me ask a question and then I'll give you another chance.

If the Defendant's convicted of first-degree murder, and only if the Defendant's convicted of first-degree murder, what I will do is tell the jury that they must consider the evidence, if any, of aggravating circumstances and the evidence, if any, of mitigating circumstances.

And I'm going to tell the jury these are the factors that you must consider. There are the aggravating factors that have been presented and these are the mitigating factors that have been presented. And you must consider the evidence that's been presented with respect to each one of those in making your determination. Would you do that?

**Juror Number 13:** Yes.

**The Court:** Follow my instruction and do that?

**Juror Number 13:** Yes.

**The Court:** Okay. That's all the question is.

**Counsel:** Are there any circumstances, generally speaking, that you would not be able to consider that you would find irrelevant.

**Prosecutor:** Objection.

**The Court:** Sustained.

**Counsel:** I have no further questions.

N.T. 9/14/1998 at 250–52.

■■■■ The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 872 (2000). The purpose of *voir dire* is solely to ensure the empanelling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. *Id.* Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what his decision will likely be under certain facts which may be developed in the trial of the case. *See Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686, 698 (1999). "*Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies." *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 451 (1995). The foregoing questions disallowed by the trial court were intended to elicit what the jurors' reactions might be when and if appellant presented certain specific types of mitigating evidence. The questions were simply not relevant in seeking to determine whether the jurors would be competent, fair, impartial and unprejudiced. Rather, the queries at issue sought to gauge the efficacy of potential mitigation strategies. Moreover, in the face of these inappropriate questions, the trial court asked appropriate general questions which revealed that the jurors in question would consider all the evidence, both aggravating and mitigating, and follow the court's instructions. Appellant had no objection to

that appropriate course of questioning. On this record, there was no trial court error.

 Appellant next claims that the testimony of the victim's mother, Gail Willard, during the guilt phase constituted improper victim impact evidence.[15] Appellant contends that, although it may not be readily apparent from the face of the record, the "real purpose" of Gail Willard's testimony allegedly was to demonstrate the impact of Aimee Willard's death on her family. Brief of Appellant at 25. In particular, appellant cites Ms. Willard's concluding testimony that it had been 837 days since she had last seen her daughter alive. N.T. 9/29/1998 at 192. Appellant argues that:

> [a] cold and sterile transcript cannot give justice to the emotional effect that such dramatic testimony conveys to jurors. What better way to demonstrate the inconceivable impact of the victim's death on a family member than to present it in terms of "837 days" and abruptly conclude the Commonwealth's case? The jurors, were left with the inescapable conclusion that [Ms.] Willard relives the anguish of her daughter's untimely demise one day at a time.

Brief of Appellant at 26. Appellant avers that Gail Willard's testimony amounted to a *de facto* victim impact statement. This claim fails.

Victim impact evidence consists of "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim." 42 Pa.C.S. § 9711(a)(2); *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253, 1259–60 (1996), *cert. denied*, 523 U.S. 1010, 118 S.Ct. 1198, 140 L.Ed.2d 327 (1998). Gail Willard's brief, matter-of-fact and accurate testi-

---

**15.** This claim would ordinarily be deemed waived due to appellant's failure to raise a contemporaneous objection to Ms. Willard's testimony at trial. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"). Nevertheless, we will reach the merits of this claim pursuant to the relaxed waiver rule applicable to capital direct appeals. *See Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 2003 WL 21255941 (2003) (stating that although relaxed waiver has been modified, that change does not apply to cases, such as this one, in which appellant's brief was already filed in this Court when *Freeman* was announced).

mony was substantially limited to statements regarding the car driven by the victim on the night of murder. For example, Ms. Willard testified that she owned the vehicle driven by her daughter on the night of the attack, that there were no abrasions on the car's back bumper as of June 14, 1996, the last time she saw the vehicle before her daughter's murder, and that there was an abrasion on the car's rear bumper when she identified the car on June 25, 1996. N.T. 9/29/1998 at 187–191. Ms. Willard did not testify concerning her daughter's character or otherwise touch upon the victim's "uniqueness as an individual human being." *McNeil*, 679 A.2d at 1259 n. 11 (Pa.1996) (quoting *Payne v. Tennessee*, 501 U.S. 808, 823, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). *Compare McNeil*, 679 A.2d at 1259 & n. 11 (victim's aunt's testimony that victim was gracious, kind and generous and that he had concern for underdogs and elderly deemed improper victim impact evidence). Nor did she testify regarding the effect of her daughter's death on herself, or any other member of the victim's family. Ms. Willard's brief testimony at the guilt phase, which was relevant to support the Commonwealth's theory that appellant caused the victim to stop her car on the night of the crime by striking her rear bumper with his own vehicle, *see* N.T. 9/29/1998 at 149–50, clearly did not constitute improper victim impact evidence, which most likely explains why no objection was made to it.

Next, appellant contends that the trial court erred in denying his oral motion *in limine* to limit the extent to which the underlying circumstances of appellant's three prior convictions for second degree murder, battery with a deadly weapon, and battery by a prisoner would be presented to the jury at the penalty phase pursuant to 42 Pa.C.S. § 9711(d)(9) (aggravating circumstance of significant history of felony convictions involving use or threat of violence to person). After appellant made the motion, the trial court consulted with counsel from both sides and an agreement was reached regarding the extent to which the underlying circumstances of these offenses would be presented to the jury. *See* N.T. 10/1/1998 & 10/2/1998 at 25 ("After consultation with counsel—and counsel

will advise me if I misstate, please—a resol[ution] of th[is] issue has been concluded"). The trial court summarized the agreement as follows:

With respect to the Nevada conviction of the Defendant for murder, the offense occurring on July 25, 1978, what is agreeable is that the fact-finder will be permitted to determine—find that that was a felony, that the Defendant—the offense occurred on July 25, 1978, that the Defendant was convicted of second degree murder on April 27 of 1979, by shooting one Larry Carrier, and he was sentenced on June 18, 1979, to life in prison in a Nevada state prison, with possibility of parole after five years; with respect to a Nevada offense occurring on January 27, 1979, where the Defendant was convicted of battery with a deadly weapon, a felony, on July 24, 1979, in that the Defendant shot one Sherry Nowman with a shotgun at 90 East Lynwood Drive, Sparks, Nevada, and that he was sentenced to ten years, consecutive to any present prison term; with respect to the third Nevada conviction, the offense occurring on May 11, 1985, that the Defendant was convicted of battery by prisoner, a felony, on March 3, 1986, and sentenced to 18 months in a Nevada state prison, consecutive to any sentence he is presently serving.

*Id.* at 25–26. Appellant acknowledged at trial that this was the agreement reached by the parties. *Id.* at 27.

▮▮▮▮▮ Despite the fact that appellant agreed at trial that the foregoing ruling was the proper disposition of his motion *in limine,* he now claims that this ruling was erroneous. This Court cannot reach this claim, even under relaxed waiver. The subject of this claim was a matter that was specifically discussed by the parties with the trial judge, resulting in an agreement on how to resolve the question. Consistently with our prior precedents in such an instance, where the issue was joined below and appellant agreed to its resolution, we will not review the claim. *See Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719, 725 (1989) (claim that trial court erred in failing to issue cautionary instruction waived where court offered to give charge and counsel failed to "take a stand" on issue and

460

failed to object when cautionary charge was not forthcoming); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 378 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) (claim that two prospective jurors were improperly excluded for cause waived where trial defense counsel indicated he had no objection to challenges for cause).[16]

Appellant next claims that the trial court erred in granting the Commonwealth's oral motion to quash the subpoena served on Gail Willard to compel her to testify at the penalty phase regarding her personal opposition to the death penalty. Appellant contends that the trial court's ruling was contrary to his right under *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), to have the jury consider any relevant mitigation evidence. Appellant specifically alleges that this testimony was relevant evidence of mitigation under the so-called "catchall" mitigating circumstance set forth at 42 Pa.C.S. § 9711(e)(8). We disagree.

Appellant's reliance upon *Skipper* is misplaced. In that case, the U.S. Supreme Court held that it was error for the trial court to preclude testimony that the defendant had made a good adjustment to prison life in the time between his arrest and trial. The Court explained that, in capital cases, the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant

16. Appellant additionally contends that the trial court erred in permitting the Commonwealth to present "prejudicial" and "irrelevant" testimony regarding the underlying circumstances of his prior conviction for battery by a prisoner. Brief of Appellant at 28. Specifically, appellant alleges error in allowing the prosecutor to elicit testimony that, while incarcerated at a prison in Nevada, appellant attacked a female visitor from behind, striking her in the face and body several times with his hands and feet while shouting obscenities at her. N.T. 10/1/1998 & 10/2/1998 at 65–68. It is well settled, however, that the Commonwealth may place the underlying facts of prior convictions introduced pursuant to section 9711(d)(9) before the jury at the penalty phase so that the jurors may assess the weight to be given to the convictions. *See, e.g., Commonwealth v. Sattazahn*, 563 Pa. 533, 763 A.2d 359, 365 (2000); *Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710 720 (1994); *Commonwealth v. Beasley*, 505 Pa. 279, 479 A.2d 460, 465 (1984). Thus, no relief is due on this claim.

proffers as a basis for a sentence less than death. *See Skipper*, 476 U.S. at 4, 106 S.Ct. 1669 (citations omitted). *See also Commonwealth v. Harris*, 817 A.2d 1033, 1053–54 (Pa. 2002). *Sub judice*, the proposed testimony of Gail Willard concerning her personal opposition to the death penalty had no bearing on appellant's character or prior record or the circumstances of the offense. Thus, its exclusion did not run afoul of *Skipper*.

Gail Willard's personal views on the death penalty also were not relevant under Pennsylvania's capital sentencing statute. This type of evidence does not fall within any of the seven specific mitigating circumstances outlined in 42 Pa.C.S. § 9711(e). Nor does it fall within the catchall mitigating circumstance outlined in § 9711(e)(8), which encompasses, "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of the offense." "The catchall mitigating circumstance obviously mirrors the requirements of *Skipper*." *Harris*, 817 A.2d at 1054. In holding that evidence that a member of the victim's family is opposed to the death penalty is irrelevant under Pennsylvania's capital sentencing scheme, we join a number of our sister jurisdictions which have considered the issue and have likewise concluded that such evidence is irrelevant to the defendant's character or record or the circumstances of the crime. *See, e.g., Greene v. State*, 343 Ark. 526, 37 S.W.3d 579, 585 (2001) (testimony of victim's wife that she has forgiven defendant and wants him to be given life sentence would fail test of evidence relating either to character or record of defendant or to circumstances of offense); *Ware v. State*, 360 Md. 650, 759 A.2d 764, 785–86 (2000) (testimony that victim's family does not wish death sentence imposed has no bearing on defendant's character, prior record, or circumstances of offense); *State v. Bowman*, 349 N.C. 459, 509 S.E.2d 428, 440 (1998) (victim's mother's "conflicting feelings" regarding death penalty have no bearing as to defendant's character, prior record, or circumstances of case); *State v. Wright*, 323 Or. 8, 913 P.2d 321, 324–27 (1996) (testimony of defendant's penalty phase witnesses that, in their personal opinion, defendant

should not be sentenced to death, is not even minimally related to defendant's character or record or circumstances of offense).

Finally, appellant raises a claim relating to the sentences imposed for rape and kidnapping. Specifically, appellant contends that the trial court erred in sentencing him under 42 Pa.C.S. § 9714(a)(1), which provided, at the time of appellant's sentencing, as follows:

> Any person who is convicted in any court of this Commonwealth of a crime of violence shall, if at the time of the commission of the current offense the person had previously been convicted of a crime of violence, and has not rebutted the presumption of high risk dangerous offender ... be sentenced to a minimum sentence of ten years of total confinement, notwithstanding any other provision of this title or other statute to the contrary.

42 Pa.C.S. § 9714(a)(1) (subsequently amended). The trial court found that appellant's prior conviction for second degree murder in Nevada in 1979 constituted a prior crime of violence for purposes of § 9714. In addition, the trial court concluded that appellant failed to rebut the presumption that he is a high risk dangerous offender. Accordingly, in addition to formally imposing the sentence of death returned by the jury, the trial court sentenced appellant to consecutive terms of 10 to 20 years' imprisonment on his rape conviction and 10 to 20 years' imprisonment on his kidnapping conviction. The trial court also sentenced appellant to 1 to 2 years' consecutive imprisonment on his abuse of a corpse conviction.

In *Commonwealth v. Butler*, 563 Pa. 324, 760 A.2d 384 (2000), this Court held that § 9714(a)(1) violated the procedural due process guarantees of the Fourteenth Amendment of the United States Constitution because it placed the burden upon the defendant to rebut the presumption that he is a high risk dangerous offender. 760 A.2d at 389.[17] Accord-

---

17. Section 9714 was subsequently amended to remove any mention of a high risk dangerous offender presumption from the statute, in apparent response to *Butler*. Under the new statute, a ten year minimum term is automatic and may not be rebutted.

ingly, appellant's sentences for the rape and kidnapping charges must be vacated and this matter remanded for resentencing on these charges as well as the abuse of a corpse charge. *See Commonwealth v. Wynn,* 567 Pa. 183, 786 A.2d 202 (2001) (*per curiam*) (remanding for resentencing where defendant sentenced under prior version of 42 Pa.C.S. § 9714(a)(1)); *Commonwealth v. Love,* 565 Pa. 470, 776 A.2d 937 (2001) (*per curiam*) (same).[18]

## III. Ineffective Assistance of Counsel

Appellant also raises four claims of ineffective assistance of trial counsel. In *Commonwealth v. Grant,* 813 A.2d 726 (Pa.2002), this Court overruled the procedural rule announced in *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977), requiring new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity, even if that first opportunity is on direct appeal and the claims of ineffectiveness were not raised in the trial court. This Court announced a new general rule providing that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738. *Grant* recognized, however, the prospect of exceptions to the general rule. 813 A.2d at 738 n. 14. The Court in *Grant* applied the new general rule to the parties in that case, dismissing Grant's claims of ineffective assistance of trial counsel—which were raised for the first time on appeal—without prejudice to his ability to raise the claims on collateral review. *Grant* further held that its new rule applies retroactively to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." *Id.* at 738.

This appeal, however, involves a circumstance not present in, or addressed by, *Grant:* appellant's claims of ineffective assistance of counsel were properly raised and preserved in the trial court. Following sentencing, trial counsel withdrew

**18.** In light of our disposition of this point of error, we need not reach appellant's alternative claim that trial counsel rendered ineffective assistance of counsel in failing to challenge the constitutionality and applicability of 42 Pa.C.S. § 9714(a)(1). *See* Brief of Appellant at 55–56.

from the case and present counsel entered the matter and filed post-sentence motions on appellant's behalf, raising, *inter alia*, the same claims of trial counsel ineffectiveness now raised in this Court. The trial court conducted hearings on the post-sentence motions on March 4 and April 20, 1999, at which appellant's trial counsel testified. Moreover, the trial court addressed the ineffectiveness claims in its opinion. *See* Trial Court slip op. at 48–59. As a result, the concerns that led this Court in *Grant* to abrogate the *Hubbard* doctrine and adopt the new general rule deferring consideration of claims of ineffective assistance of trial counsel to collateral review are simply not present in this context.

This Court's holding in *Grant* was grounded upon concerns which affected both the ability of the defendant to develop his claims and the reviewing court's ability to consider the claims. Thus we noted that, when appellate courts reviewed a claim of ineffective assistance of counsel raised for the first time on appeal under *Hubbard*, there was rarely a trial court opinion addressing the issue, which poses a "substantial impediment to meaningful and effective appellate review." 813 A.2d at 733–34 (quoting *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 308 (1998)). In addition, we expressed concern that review under *Hubbard* frequently obliged the appellate courts to consider matters not of record, a function that appellate courts normally do not perform. Under *Hubbard*, appellate courts often had to engage in fact-finding in the form of speculation concerning the strategy counsel pursued at trial, a function that they were ill-suited to assume. Finally, we noted the difficult task that faced appellate counsel under *Hubbard* in attempting to uncover and develop extra-record claims of counsel ineffectiveness in the truncated time frame available on direct appeal review, a task further complicated by the fact that counsel's duty in this regard is not entirely clear, at least as a constitutional matter. 813 A.2d at 734–36.

*Sub judice*, there is a trial court opinion addressing the ineffectiveness claims raised on appeal. We observed in *Grant* that "the trial court is in the best position to review claims related to trial counsel's error in the first instance as

that is the court that observed first hand counsel's allegedly deficient performance." 813 A.2d at 737. In contrast to the more common situation where ineffectiveness allegations are raised for the first time on appeal and the trial court is excluded from the review process, here, this Court has the benefit of the trial judge's evaluation of trial counsel's conduct in reviewing the claims, rendered close in time to the trial.

There is also a record devoted to the ineffectiveness claims. Indeed, trial counsel testified at the hearings on appellant's post-sentence motions concerning their versions of events at trial, their trial strategy, and their reasons for the actions or inactions that present counsel alleges to be improper. *See* N.T. 3/4/1999 at 12–220, 222–275. In light of this ample record, there is no need to rely upon extra-record sources, such as averments in appellate briefs or affidavits, to resolve appellant's ineffectiveness claims, as is so often the case when such claims have not been raised and preserved in the trial court.

Correspondingly, the extensive record below exploring why trial counsel proceeded in the manner that they did means that there is no danger of engaging in appellate fact-finding in the form of speculation concerning the strategy actually pursued by trial counsel. In this circumstance, an appellate court may review trial counsel's strategy from the "horse's mouth," as it were, and not engage in after-the-fact guesswork.

Notably, a significant number of the state and federal courts that have adopted a general rule prohibiting review of ineffectiveness claims on direct appeal recognize an exception to the general rule where the claims were presented to the trial court. *See United States v. McIntosh,* 280 F.3d 479, 481 (5th Cir.2002) (claim of ineffective assistance of counsel may be reviewed on direct appeal if presented to trial court); *Dodson v. State,* 326 Ark. 637, 934 S.W.2d 198, 201 (1996) (same); *Jackson v. State,* 534 So.2d 689, 692 (Ala.Crim.App.1988) (same); *State v. Van Cleave,* 239 Kan. 117, 716 P.2d 580, 582 (1986) (same); *Accord United States v. Kincaide,* 145 F.3d 771, 785 (6th Cir.1998) (claim of ineffective assistance of counsel may be reviewed on direct appeal if record is adequate

to assess merits of claim); *United States v. Cocivera,* 104 F.3d 566, 570 (3rd Cir.1996) (same); *United States v. Eltayib,* 88 F.3d 157, 170 (2d Cir.1996) (same); *People v. Mendoza Tello,* 15 Cal.4th 264, 62 Cal.Rptr.2d 437, 933 P.2d 1134, 1135 (1997) (same); *State v. Henry,* 271 Mont. 491, 898 P.2d 1195, 1197–98 (1995) (same); *State v. Barrett,* 577 A.2d 1167, 1172 (Me.1990) (same); *State v. Seiss,* 428 So.2d 444, 449 (La.1983) (same); *State v. Lucas,* 323 N.W.2d 228, 232 (Iowa 1982) (same).

Lastly, the difficulties confronting appellate counsel in discovering and developing ineffectiveness claims within the limited amount of time available for filing a direct appeal noted by this Court in *Grant* are obviously not implicated—at least as to the claims presented here—since the claims have been raised and fully developed at a hearing in the trial court.

■■■ For the above reasons, we hold that this circumstance is an exception to the general rule of deferral in *Grant.* Accordingly, we proceed to consideration of appellant's ineffectiveness claims.

■■■ Appellant forwards his claims of ineffectiveness under both the federal and the Pennsylvania Constitutions. He does not argue that the right to counsel implicated by his claims differs under those charters, instead forwarding a single argument as to each claim. In any event, it is well-settled that the test for counsel ineffectiveness is the same under both charters: It is the performance and prejudice test as set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Commonwealth v. Busanet,* 817 A.2d 1060, 1066 (Pa.2002); *Commonwealth v. Jones,* 571 Pa. 112, 811 A.2d 994, 1002 (2002); *Commonwealth v. Bond,* 819 A.2d 33, 41–42 (Pa.2002); *Commonwealth v. (Charles) Pierce,* 515 Pa.153, 527 A.2d 973 (1987). To prevail on a claim that counsel was constitutionally ineffective, the appellant must overcome the presumption of competence by showing that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable proba-

bility that the outcome of the challenged proceeding would have been different. *Commonwealth v. (Michael) Pierce,* 567 Pa.186, 786 A.2d 203, 213 (2001); *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999).[19] A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. *(Michael) Pierce,* 786 A.2d at 221–22; *see also Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met.").

Appellant first alleges that trial counsel was ineffective in failing to call his mother, Carrie Bomar Ganges, and a woman named Betty Powell to testify on his behalf at the guilt phase of his trial. Appellant contends that his mother would have testified that he drove her to a doctor's appointment at 9:30 a.m. on the morning of June 20, 1996, which would have tended to refute the Commonwealth's theory that appellant returned to the crime scene later on in the morning of June 20th and placed the sneakers and panties of the victim at the scene.[20] Appellant further avers that Betty Powell would have testified that on the morning of June 20, 1996, she observed a white male dump an object which could have been a body at the vacant lot at 16th Street and Indiana Avenue in Philadelphia where Aimee Willard's body was later discovered. Appellant asserts that this testimony could have established that a third party of another race was actually responsible for disposing of the victim's body.

**19.** Although the test for ineffectiveness in Pennsylvania is the same as *Strickland's* two-part performance and prejudice standard, in application this Court has come to characterize the test as a tripartite one, by dividing the performance element into two distinct parts, *i.e.,* arguable merit and lack of reasonable basis. *Busanet,* 817 A.2d 1060, 2002 WL 31846306, at *3 n. 11; *Jones,* 811 A.2d at 1003 n. 7.

**20.** This theory was predicated on the fact that these items were clean and dry to the touch when the police discovered them even though it had rained earlier in the morning and the ground underneath these items was wet. *See* N.T. 9/22/1998 at 18–20.

468

To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, an appellant must demonstrate that: (1) the witness existed; (2) the witness was available; (3) trial counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant. *Fletcher*, 750 A.2d at 275.

At the evidentiary hearings on appellant's post-sentence motions, trial counsel noted a number of reasonable concerns that led him to not call Ms. Ganges as a witness at the guilt phase. Trial counsel testified that, when he interviewed Ms. Ganges, she appeared to him to have no independent recollection of appellant driving her to the doctor's office on the morning of June 20, 1996, or of any other events on that day, and that he was concerned that she would not fare well under cross-examination by the Commonwealth. N.T. 3/4/1999 at 111–12. In addition, trial counsel testified that because Ms. Ganges was appellant's mother, he felt that the jury would view her as biased in favor of her son and not credible, particularly since there was no evidence that corroborated her story. *Id.* at 113. Further, trial counsel believed that Ms. Ganges's testimony might actually lend credence to, rather than cast doubt upon, the Commonwealth's theory that appellant returned to the scene of the crime later in the morning of June 20, and placed the victim's sneakers and panties at the scene. Trial counsel reasoned that there was no physical evidence or any eyewitnesses that conclusively placed appellant at the crime scene later in the morning of June 20th, and that introducing evidence to rebut the Commonwealth's theory would lead the jury to conclude that the theory was more compelling than it in reality was. *Id.* at 113–14. Trial counsel also testified that Ms. Ganges had repeatedly indicated to him that she believed the prosecution of her son was tantamount to a lynching, and that he was concerned that, if called to testify, she would express these personal views, which would alienate the jury and hinder the defense. *Id.* at 120. This concern proved well-founded in light of Ms. Ganges

testimony at the penalty phase in which, among other things, she accused the trial prosecutor of being a liar, a cheat, and a disgrace to the court, and asserted that the jury had not followed the evidence and that its guilty verdict was racially motivated. N.T. 10/5/1998 at 94. Under these circumstances, trial counsel clearly had a reasonable basis for not calling Ms. Ganges to testify at the guilt phase; therefore, he was not ineffective. *See Fletcher*, 750 A.2d at 275.

Trial counsel was also not ineffective for failing to call Betty Powell at the guilt phase. Trial counsel had a private investigator look into Ms. Powell's story and the investigator determined that Powell knew Gilda Drummond, a member of appellant's extended family. *See* N.T. 4/20/1999 at 53–54. In addition, the investigator was unable to corroborate Ms. Powell's alleged observations through any other source. *See* N.T. 3/4/1999 at 88, 208. In light of Ms. Powell's connection to appellant's family, and the fact that her testimony could not be corroborated, trial counsel concluded that she would not be a helpful witness. This was a reasonable strategic decision by counsel. Further, we are more than satisfied that appellant was not prejudiced by the absence of Ms. Powell's testimony. Ms. Powell testified at the post-sentence evidentiary hearings that she did not see the object that was dumped by the white male on the morning of June 20, 1996, because it was covered by a white sheet. N.T. 4/20/1999 at 158. She did testify, however, that it measured only approximately three and one-half feet in length. *Id.* at 161. Tellingly, Ms. Powell further testified that she was alone at the time she made her observations. *Id.* at 181. It is highly unlikely that the vague, uncorroborated testimony of a person acquainted with a member of appellant's family that she saw an unidentified white male dump an unknown object much shorter in length than the victim at a vacant lot where people frequently leave trash and debris would have been even marginally helpful to appellant's defense—especially when his own statements and DNA tied him to the offense. Accordingly, this claim fails.

Appellant next alleges that trial counsel was ineffective in failing to present a diminished capacity defense.[21] Dr. Gerald Cooke, a clinical and forensic psychologist retained by the defense, examined appellant on April 30, 1998. Dr. Cook informed trial counsel that appellant could possibly have a "cognitive disorder," which would support a defense of diminished capacity at trial, but that further testing was required to confirm this diagnosis. Thereafter, on May 1, 1998, trial counsel discussed the possibility of pursuing a defense of diminished capacity with appellant. Trial counsel explained the defense to appellant and also explained to him that in order to effectively pursue this defense, appellant would have to undergo additional neuropsychological testing. Appellant, who had some significant experience with the criminal justice system, responded that he was not interested in a defense that would, at best, merely reduce an inevitable homicide conviction to third-degree murder. In addition, he stated that his mental state was irrelevant to the case because he did not kill Aimee Willard and that he would not cooperate with further psychological testing. *See* N.T. 3/4/1999 at 136–37. Shortly prior to trial, counsel again discussed the possibility of pursuing a diminished capacity defense with appellant, and appellant reiterated that he would not pursue this defense and was unwilling to submit to the additional psychological testing necessary to effectively present it. *See id.* at 149–51. This Court has repeatedly noted that "[a]n accused cannot refuse to cooperate with counsel in preparation of a particular trial strategy and then argue counsel's ineffectiveness for failing to pursue that course of action." *Commonwealth v. Lester*, 554 Pa. 644, 722 A.2d 997, 1008 (1998) (quoting *Commonwealth v. Pierce*, 537 Pa. 514, 645 A.2d 189, 196 (1994)). If this Court were to entertain such claims, it would allow a defendant to essentially build-in claims of counsel ineffectiveness. Therefore, this claim fails. *See Lester*, 554 Pa. 644, 722

---

21. In asserting a diminished capacity defense to a charge of first-degree murder, a defendant concedes his culpability generally but alleges that he is incapable of forming the specific intent to kill and thus may only be found guilty of murder in the third degree. *See Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 444 (1998).

A.2d 997 at 1008 (rejecting claim that trial counsel was ineffective for failing to argue to jury or request jury instruction on defense of diminished capacity where defendant refused to cooperate with counsel or psychiatrist hired by counsel to examine him).

Next, appellant asserts that trial counsel was ineffective in failing to move for a second change of venue or venire. Appellant filed a motion for a change of venue or venire with the trial court on March 23, 1998. Following a hearing on June 5, 1998, the trial court denied the motion for a change of venue. The trial court granted the motion for a change of venire, however, and appellant's jury was selected from Westmoreland County. Appellant alleges that, on the first day of jury selection, September 14, 1998, an article appeared on the front page of the *Tribune–Review,* a newspaper published in Westmoreland County, which described the gruesome nature of the Willard murder, made reference to appellant's prior criminal history and the fact that he had served twelve years in a Nevada prison for killing another man, noted that he was later arrested on a burglary charge, and revealed that he was the prime suspect in the killing of another woman in Philadelphia in March of 1997. Appellant further contends that another article appeared in the *Tribune–Review* the following day, which focused on the extra security measures being taken by sheriffs from Delaware and Westmoreland counties with respect to the prosecution and made specific reference to an electric restraining harness worn under appellant's shirt. Appellant asserts that, in light of this allegedly "sensational" and "inflammatory" publicity, trial counsel should have requested a second change of venue or venire. Brief of Appellant at 52. No relief is due.

■■■■■ The factors to be considered by a trial court in determining whether there should be a change of venue or venire are as follows:

> The mere existence of pretrial publicity does not warrant a presumption of prejudice. *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313, 317 (1992). If pretrial publicity occurred, its nature and effect on the community must be

considered. *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 292–293 (1978). Factors to consider are whether the publicity was sensational, inflammatory, and slanted toward conviction rather than factual and objective; whether the publicity revealed the accused's prior criminal record, if any; whether it referred to confessions, admissions, or reenactments of the crime by the accused; and whether such information is the product of reports by the police or prosecuting officers. *Id.* If any of these factors exists, the publicity is deemed to be inherently prejudicial, and we must inquire whether the publicity has been so extensive, so sustained, and so pervasive that the community must be deemed to have been saturated with it. *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035, 1037 (1990). Finally, even if there has been inherently prejudicial publicity which has saturated the community, no change of venue [or venire] is warranted if the passage of time has significantly dissipated the prejudicial effects of the publicity. *Commonwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 906 (1991); *Breakiron*, 571 A.2d at 1037.

*Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 104 (1996).

■ The mere appearance of two articles in a local Westmoreland County newspaper on succeeding days in September 1998, did not constitute publicity which was so extensive, sustained, and pervasive that the community was saturated with it. Indeed, when the trial court questioned the prospective jurors regarding their exposure to media coverage of the case, only 19 venirepersons out of a total venire of approximately 135 individuals responded that they had seen or heard **anything** regarding the case in the media. *See* N.T. 9/14/1998 at 19–64. Of the individuals who actually served on the jury, none had been exposed to media coverage of the case except for one alternate juror who did not participate in the jury deliberations.[22] Thus, a change of venue or second change of

---

22. This individual indicated during *voir dire* that, although she had read a newspaper article concerning the case, she could be a fair, just, and

venire was not warranted in this case. Because appellant's underlying claim that he was entitled to a change of venue or venire lacks arguable merit, trial counsel was not ineffective for failing to request such a change. *See Commonwealth v. Proctor*, 558 Pa. 382, 737 A.2d 724, 731–32 (1999) (counsel was not ineffective for failing to request change of venue or venire because such change would not have been warranted).

Further, the record reflects that trial counsel had a reasonable basis for failing to request a second change of venue or venire. Trial counsel testified that he conducted a thorough investigation into the suitability of selecting the jury from Westmoreland County. Among other things, trial counsel investigated the County's jury selection process, reviewed the County's population demographics, spoke with the editor of the *Tribune–Review* and other newspaper reporters, reviewed the local press coverage of the case, had discussions with attorneys who practice in the County, and interviewed individuals at a local mall, to determine whether people in the area were familiar with the matter. *See* N.T. 3/4/1999 at 153–63. Trial counsel, together with appellant, ultimately concluded that Westmoreland County was a proper county from which to select the jury because few people in the County had previously heard of the case. *See id.* at 163. This conclusion was clearly reasonable. Because trial counsel had a reasonable basis for not seeking a second change of venue or venire, counsel's performance may not be deemed ineffective in hindsight.

Finally, appellant alleges that trial counsel was ineffective in failing to request a continuance for additional neuropsychological testing at the penalty phase. Appellant asserts that further testing could have established that he has a cognitive disorder which would have been "powerful" and "compelling" evidence in mitigation at the penalty phase. Brief of Appellant at 55. As discussed above, following the initial examination of appellant by defense psychologist Dr.

impartial juror and render a fair and just decision. N.T. 9/16/1998 at 859–70.

Cooke on April 30, 1998, appellant expressed his unwillingness to submit to additional psychological testing. Nonetheless, on September 26, 1998, appellant did submit to a second examination by Dr. Cooke. Appellant, however, appeared distracted and unmotivated during portions of the examination. In addition, appellant refused to complete one of the tests that is part of the neuropsychological battery of tests used to determine whether an individual suffers from a cognitive disorder. As a result, Dr. Cooke was unable to determine whether appellant had a cognitive disorder. *See* N.T. 4/20/1998 at 120–33. A second psychologist retained by the defense, Dr. Edward Dougherty, also attempted to examine appellant. Dr. Dougherty was able to interview appellant, but appellant refused to submit to any type of neuropsychological testing. Thereafter, appellant told trial counsel that he was "finished" with testing and did not want any additional testing performed. *See* N.T. 3/4/1999 at 246–48. As we have noted above, a defendant cannot refuse to cooperate with counsel in preparation of a particular trial strategy and then later argue counsel's ineffectiveness for failing to pursue that course of action. *Lester*, 722 A.2d at 1008; *Pierce*, 645 A.2d at 196. Accordingly, appellant's claim that trial counsel should have sought a continuance of the penalty phase to pursue additional neuropsychological testing even though appellant had repeatedly refused to cooperate with such testing and expressly indicated that he did not want such testing to be conducted, necessarily fails.[19]

## IV. Denial of Post–Sentence Motion for Competency Examination

In his penultimate claim for relief, appellant alleges that the trial court erred in denying his post-sentence motion for an additional competency examination to determine his competen-

---

**19.** Mr. Justice Saylor holds the view that, when faced with a client who is not cooperating in critical aspects of trial preparation in a capital case, trial counsel has an obligation to apprise the trial court at the earliest opportunity to enlist the court's direction and assistance. *See, e.g., Commonwealth v. Marinelli*, 570 Pa. 622, 810 A.2d 1257, 1280 (2002) (Saylor, J., concurring).

cy both to participate and assist in his defense with present counsel and his competency to be executed. Appellant does not claim specifically that he is incompetent. Rather, he argues that "the possibility exists that he may have limited intellectual ability and learning disability due in part to a cognitive disorder (organic brain dysfunction) from birth or a serious personality disorder which could hinder his ability to cooperate with counsel[,]" and that further examination is required to ensure that he is competent. Brief of Appellant at 58. This claim does not merit relief.

Pursuant to this Commonwealth's Mental Health Procedures Act, a defendant must be competent to be tried, convicted, or sentenced. 50 P.S. § 7402(a); *Commonwealth v. Haag*, 570 Pa. 289, 809 A.2d 271, 277 (2002). A defendant is legally incompetent if he is "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense." *Id.* In addition, the Eighth Amendment prohibits the execution of a defendant who does not "comprehend[ ] the reasons for the death penalty and its implications." *Haag*, 809 A.2d at 277 (quoting *Commonwealth v. Jermyn*, 539 Pa. 371, 652 A.2d 821, 824 (1995), *cert. denied*, 515 U.S. 1126, 115 S.Ct. 2285, 132 L.Ed.2d 287 (1995)). A determination of a defendant's competency rests in the sound discretion of the trial court and can be disturbed on appeal only on a showing of an abuse of that discretion. *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 899 (1997); *Commonwealth v. Sam*, 535 Pa. 350, 635 A.2d 603, 606 (1993), *cert. denied*, 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). Furthermore, this Court has stated that a trial judge's competency determination should be afforded "great deference" because the judge has the opportunity to personally observe the defendant's behavior. *Appel*, 689 A.2d at 899 (quoting *Commonwealth v. Chopak*, 532 Pa. 227, 615 A.2d 696, 700 (1992) (further citation omitted)).

*Sub judice*, Dr. Robert L. Sadoff, M.D., a psychiatrist appointed by the trial court, conducted a competency examination of appellant prior to trial and concluded that appellant

was competent to stand trial. *See* N.T. 1/16/1998 at 2–5. In addition, one of the psychologists retained by the defense, Dr. Cooke, who, as we have described earlier, examined appellant on April 30, 1998 and again on September 26, 1998, testified at the post-sentence evidentiary hearings that "[t]here was no question whatsoever" that appellant was competent to stand trial. N.T. 4/20/1999 at 117. Further, the testimony of appellant's trial counsel clearly reflected that appellant understood the nature of the proceedings against him and actively participated and assisted in his defense. N.T. 3/4/1999 at 12–220, 222–275. Under these circumstances, the trial court clearly did not abuse its discretion in denying appellant's post-sentence motion for another competency examination.

## V. Constitutionality of Death Penalty Statute

Finally, appellant alleges that Pennsylvania's death penalty statute, 42 Pa.C.S. § 9711 *et seq.*, is unconstitutional as applied in Delaware County because the Delaware County District Attorney's Office has consistently requested the imposition of the death penalty based upon the race, gender, and economic status of defendants. In support of this claim, appellant alleges that, from January 1996 until August 1998, there were a total of 40 homicides in Delaware County and 48 defendants were charged with these killings. Appellant contends that of these 48 defendants, 11 were white males and 31 were black males. Appellant asserts that the Delaware County District Attorney's Office sought the death penalty against 2, or 18.2%, of the white male defendants, and 8, or 25.2%, of the black male defendants. Appellant then avers that the Delaware County District Attorney's Office is 1.42 times more likely to pursue the death penalty against a black male defendant than against a white male defendant.

Even assuming these statistics are accurate, such naked statistics are obviously insufficient to demonstrate that the death penalty statute has been applied in a discriminatory fashion in Delaware County. To establish a claim of selective prosecution, a defendant must demonstrate that others **similarly situated** were not similarly prosecuted, and that this

disparate treatment was based on impermissible grounds such as race, gender, religion, the exercise of some constitutional right, or any other such arbitrary factor. *See Commonwealth v. Mulholland,* 549 Pa. 634, 702 A.2d 1027, 1034 (1997) (citing *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). The statistics cited by appellant demonstrate only that more blacks than whites were charged with capital murder in Delaware County during a specific two and a half year period. They do not establish that there were other individuals who were not black and who were similarly situated to appellant and the other black defendants charged with capital murder during this period, but were not so prosecuted. Accordingly, appellant has failed to satisfy the first prong of the selective prosecution standard. *See United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (study indicating that in every one of the 24 crack cocaine prosecutions closed by U.S. Attorney's Office in 1991 defendant was black, was insufficient to establish discriminatory effect; to establish discriminatory effect in race case, claimant must show that similarly situated defendants were not prosecuted based on their race). Moreover, appellant has offered no evidence that the Commonwealth's charging decisions in these cases were motivated by improper considerations rather than by the facts of the cases themselves that are inevitably intensely fact-specific. For this reason as well, appellant's claim of discriminatory application of the death penalty fails. *See Commonwealth v. Crews,* 552 Pa. 659, 717 A.2d 487, 489 (1998) (absent some showing that prosecutorial discretion was abused in selection of cases in which death penalty was sought, claim that death penalty disproportionately applied to poor lacks necessary foundation and is, therefore, meritless).

## VI. Statutory Review

Having addressed each of appellant's claims, this Court is also required to conduct a statutory review of the death sentence. Pursuant to 42 Pa.C.S. § 9711(h)(3), this

Court must affirm the sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

*Id.* After careful review of the record below, we conclude that the sentence imposed was not a product of passion, prejudice or any other arbitrary factor but, instead, was the product of overwhelming evidence. Second, the evidence produced at trial and of record is sufficient to establish the aggravating factors found by the jury: the killing was committed during the perpetration of a felony, appellant has a significant history of felony convictions involving the use or threat of violence to the person, and appellant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue. The jury concluded that these aggravating circumstances outweighed the mitigating circumstance found, *i.e.*, any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. Thus, it was statutorily required to impose this sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv).

Accordingly, we affirm the judgment of sentence of death. We vacate the judgments of sentence for rape, kidnapping and abuse of corpse and remand for resentencing only as to these convictions.[23]

Former Chief Justice FLAHERTY and former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice NIGRO files a concurring opinion.

---

**23.** Since we uphold the death sentence, the Prothonotary of this Court is directed to transmit to the Governor's office a full and complete record of the trial, sentencing hearing, imposition of sentence and opinion and order by the Supreme Court in accordance with 42 Pa.C.S. § 9711(i).

JUSTICE NIGRO CONCURRING.

I join the majority opinion with the limited exception of its discussion regarding the "bring-down" order used to transfer Appellant from the prison to the CID offices for questioning regarding the Willard murder case.

Although I fully agree with the majority that the "bring-down" order was undoubtedly erroneous, I cannot agree with the majority's seemingly dismissive approach to the *misuse* of that erroneous order. To that end, the majority notes that Appellant does not cite to any evidence of record establishing that the error in the order was anything other than a mere "mistake" or "oversight." While that may be true, it still remains that the order only authorized the transfer of Appellant *for a hearing* and not for what it was ultimately used for-the questioning of Appellant regarding the Willard case. In my view, the Commonwealth should simply not be allowed to use a court order for one purpose when that order explicitly authorizes its use only for a different purpose. *See Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537, 542 (1986) ("The misuse of a court order is an affront to the court issuing that order.") Nonetheless, I ultimately agree with the majority that Appellant is not entitled to relief on this claim because the transfer did not, under the circumstances here, implicate Appellant's Fourth Amendment rights.