COMMONWEALTH of Pennsylvania, Appellee

v.

Guy Angelo SILEO Jr., Appellant.

Superior Court of Pennsylvania.

Submitted April 5, 2011.

Filed Sept. 1, 2011.

Jules Epstein, Philadelphia, for appellant.

Robert M. Falin, Assistant District Attorney, Norristown, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., BENDER, BOWES, PANELLA, DONOHUE, SHOGAN, MUNDY, OTT, and FREEDBERG, JJ.

OPINION BY BOWES, J.:

Guy Angelo Sileo Jr. appeals from the August 4, 2009 order denying him PCRA relief following a remand by a prior three-judge panel of this Court. We affirm.

We first review the procedural history of the present matter. Appellant and Jim Webb were business partners operating a restaurant known as General Wayne Inn (the "Inn") in Lower Merion, Pennsylvania. The Inn was incorporated, and Appellant and Mr. Webb each owned fifty percent of its stock. On December 27, 1996, Mr. Webb was found dead in his office located on the third floor of the restaurant. He was killed between 7:00 p.m. and midnight on December 26, 1996, by a single gunshot to the back of the head inflicted by a .25 caliber Winchester bullet. At the time of the murder, the Inn was in critical financial shape. Mr. Webb's life was insured to the benefit of the business and Appellant, but Mr. Webb had stated his intent to terminate his business relationship with Appellant and start his own restaurant.

Appellant was interviewed by police and admitted that he owned a .25 caliber Phoenix Arms handgun, which police recovered. Testing on the .25 caliber Phoenix Arms gun revealed that it was not the murder weapon. Appellant was called to testify before a grand jury investigating Jim Webb's murder and represented that the .25 caliber Phoenix Arms gun was the only .25 caliber weapon that he had ever owned. Subsequently, one of Appellant's former employees agreed to a consensual wiretap, and the employee recorded a conversation with Appellant wherein Appellant stated that he had owned a different .25 caliber handgun. Appellant was charged with and found guilty by a jury of perjury and false swearing, and we affirmed the judgment of sentence on appeal. *Commonwealth v. Sileo,* 750 A.2d 375 (Pa.Super.1999) (unpublished memorandum), *appeal denied,* 568 Pa. 660, 795 A.2d 974 (2000).

Following affirmance of his perjury conviction, on October 24, 2000, Appellant was charged with homicide and possession of an instrument of crime ("PIC") in connection with Mr. Webb's death. The case proceeded to a jury trial where Appellant testified that at 10:00 p.m. on December 26, 1996, he left the Inn, where Mr. Webb was alone and alive, and went to a local bar to drink. On August 1, 2001, a jury found Appellant guilty of first degree murder and PIC. Trial counsel, Richard Winters, Esquire, withdrew, and Howard Bashman, Esquire, represented Appellant at sentencing. Mr. Bashman then filed a post-sentence motion raising eight allegations of trial counsel's ineffectiveness. A hearing on those claims was held and on direct appeal, where Appellant remained represented by Mr. Bashman, we affirmed. *Commonwealth v. Sileo,* 837 A.2d 1181 (Pa.Super.2003).

In that direct appeal, Appellant raises a claim of ineffectiveness of trial counsel as well as preserved issues of trial court error. We ruled that Appellant's ineffectiveness arguments were subject to direct review under the exception to *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), created in *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003),[1]

---

1. As we indicated in *Commonwealth v. Barnett,* 2011 PA Super 147, 25 A.3d 371 (*en banc*), recent Supreme Court precedent has effectively overruled *Bomar.* Additionally, the continued viability of *Bomar* is currently being examined by our Supreme Court in *Commonwealth v. Holmes,* 606 Pa. 209, 996 A.2d

479, 480 (2010), where allowance of appeal was granted as to the following issues:

Whether the claims of ineffective assistance of counsel which are the exclusive subject of this *nunc pro tunc* direct appeal: (1) are reviewable on direct appeal under *Commonwealth v. Bomar,* 573 Pa. 426, 826

and we affirmed. Our Supreme Court denied further review. *Commonwealth v. Sileo*, 578 Pa. 708, 853 A.2d 361 (2004).

Appellant filed a timely *pro se* PCRA petition, and then retained Jules Epstein, Esquire, who filed a counseled petition on June 6, 2003. PCRA counsel raised numerous claims of ineffective assistance of counsel, including that trial counsel rendered ineffective assistance when he failed to request an alibi instruction. The PCRA court conducted an evidentiary hearing but confined the parameters of that hearing and did not permit the presentation of evidence as to Appellant's position that trial counsel improperly failed to ask for an alibi instruction. The PCRA court concluded that trial counsel was not ineffective in that respect because an alibi instruction was not warranted under the evidence presented at trial. After the hearing, the PCRA court denied relief.

On appeal, a three-judge panel affirmed the PCRA court's decision to deny relief with a single exception: it concluded that Appellant's testimony established the existence of an alibi and thus was sufficient to support an alibi instruction. *Commonwealth v. Sileo*, 953 A.2d 606 (Pa.Super.2008) (Bowes, J., dissenting) ("prior PCRA panel"). The prior PCRA panel therefore remanded the "case for further proceedings to determine the reasonableness of trial counsel's decision in this regard. *Commonwealth v. Hawkins*, 586 Pa. 366, 894 A.2d 716 (2006)." Superior Court Memorandum, 3/25/08, at 26. In

summarizing its disposition of the PCRA appeal, the prior PCRA panel indicated that it affirmed all the rulings of the PCRA court but was remanding "the case for an evidentiary hearing limited to the strategic basis underlying the decision of trial counsel not to request an alibi instruction, as well as post-trial counsel's decision not to raise that issue." *Id.*

On remand, the PCRA court conducted the requisite hearing, where trial counsel indicated that he did not request an alibi instruction because he did not believe that Appellant's testimony constituted an alibi but instead, was a general denial of guilt. Appellate counsel stated, similarly, that he did not litigate the issue of trial counsel's ineffectiveness for not requesting for an alibi instruction since he did not believe that Appellant's testimony established an alibi.

Since the prior PCRA panel determined that the underlying issue had merit in that Appellant's testimony did establish an alibi and, since trial and appellate counsel had not articulated a reasonable basis for their decisions, the PCRA court addressed the third prong of the test applicable to analyzing ineffectiveness of counsel. Specifically, the PCRA court considered whether Appellant was prejudiced by trial counsel's failure to request an alibi instruction. Concluding that there was no prejudice, the PCRA court again denied relief.

A three-judge panel of this Court reversed. That panel ruled that the PCRA court was permitted to address the issue of

A.2d 831 (2003); (2) should instead be deferred to collateral review under the general rule in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) that defendants should wait until the collateral review phase to raise claims of ineffective assistance of counsel; or (3) should instead be deemed reviewable on direct appeal only if accompanied by a specific waiver of the right to pursue a first PCRA petition as of

right. *See Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 148 n. 22 (2008) ("Prolix collateral claims should not be reviewed on post-verdict motions unless the defendant waives his right to PCRA review...."); *see also Commonwealth v. Liston*, 602 Pa. 10, 977 A.2d 1089, 1095–1101 (2009) (Castille, C.J., concurring, joined by Saylor, J., & Eakin, J.).

prejudice but concluded that trial counsel's failure to request an alibi instruction was inherently prejudicial, relying upon *Commonwealth v. Weinder*, 395 Pa.Super. 608, 577 A.2d 1364 (1990).[2] *En banc* review of that panel decision was granted. The matter is now ready for disposition. In this appeal, Appellant raises three issues. First, Appellant maintains that, under the prior PCRA panel ruling, the PCRA court was precluded from considering the issue of prejudice and that once the PCRA court determined that counsel had no reasonable strategic basis in failing to request an alibi instruction, the PCRA court was required to grant Appellant a new trial. Appellant also challenges the PCRA court's conclusion that he was not prejudiced by counsel's failure to ask for an alibi instruction. Finally, Appellant argues that the law of the case precludes this Court from reconsidering the propriety of the prior PCRA panel's finding that Appellant's testimony was sufficient to support an alibi instruction.

We have concluded that the PCRA court was not precluded from considering the issue of prejudice under the prior PCRA panel's remand order. We also uphold the PCRA court's conclusion that Appellant was not prejudiced by trial counsel's failure to request an alibi instruction. In light of our disposition of these contentions, we need not address the allegation that the doctrine of the law of the case prevents us from reversing the prior PCRA panel's construction of Appellant's testimony.

■ "[A]s a general proposition, [the appellate courts] review a denial of PCRA relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." *Commonwealth v. Dennis*, —— Pa. ——, 17 A.3d 297, 301 (2011). We begin our analysis by repeating the oft-quoted elements that a defendant must establish in order to obtain a new trial based upon an allegation of ineffective assistance of counsel:

To obtain relief on a claim of ineffective assistance of counsel, a petitioner must rebut [a] presumption [that counsel was effective] and demonstrate that counsel's performance was deficient, and that such performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In our Commonwealth, we have rearticulated the *Strickland* Court's performance and prejudice inquiry as a three-prong test. Specifically, a petitioner must show: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's action or inaction; and (3) counsel's error caused prejudice such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Pierce*, 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987).

*Id.*, 17 A.3d at 301.

■ As noted, we first address whether the PCRA court was precluded from analyzing whether trial counsel's ineffectiveness prejudiced Appellant under the prior PCRA panel decision. We first note that within the decision, the word prejudice was not mentioned in connection with the alibi issue. The analysis of the prior PCRA panel was confined to a review of the merits of the underlying assertion, which was whether Appellant's testimony constituted an alibi. Additionally, the prior

---

**2.** To the extent that the *Weinder* decision holds that it is presumptively prejudicial for trial counsel not to seek an alibi instruction, that case has been overruled by our Supreme Court's decision in *Commonwealth v. Hawkins*, 586 Pa. 366, 894 A.2d 716 (2006), as discussed extensively in the text, *infra*.

PCRA panel did not mention prejudice as a matter to be addressed at the hearing; such mention was unnecessary as the existence of prejudice would not be the subject of a hearing but rather would be determined by an examination of the trial proceedings. Finally, we conclude that the PCRA court was permitted to consider the prejudice question because the prior PCRA panel specifically referenced the Supreme Court's decision in *Commonwealth v. Hawkins, supra,* in connection with its resolution of the contention.

Our considered review of the *Hawkins* decision reveals that it mandates that all three aspects of the ineffectiveness test be satisfied before a new trial can be awarded on the ground that trial counsel was ineffective for failing to request an alibi instruction. In *Hawkins,* the defendant presented an alibi witness at trial, but trial counsel decided not to request an alibi instruction based upon strategical grounds. The PCRA court decided that trial counsel's decision not to seek a jury charge regarding defendant's alibi evidence constituted ineffectiveness *per se* and granted the defendant a new trial. We affirmed, holding that if an alibi is presented, an alibi instruction must be given. We acknowledged that extensive evidence was presented against the defendant but believed that it was prejudicial *per se* for counsel not to ask for an alibi instruction if such an instruction is supported by the proof.

Our Supreme Court reversed. It held that a new trial cannot be granted where alibi evidence is presented and an instruction is not requested unless all three aspects of the *Pierce/Strickland* test are satisfied. It ruled specifically that counsel's failure to request an alibi instruction does not constitute prejudice *per se* and that the *Pierce* prejudice aspect must be satisfied by the defendant in this context. *Id.* at

729. The *Hawkins* Court noted its disapproval of the fact that this Court had not conducted an appropriate analysis of whether the defendant was prejudiced by the absence of an alibi instruction, given that the evidence of his guilt was overwhelming.

The Supreme Court then repeated, "[W]e emphasize that the law not only permits the application the *Pierce* test in its entirety, but indeed compels it." *Id.* at 731 n. 20. Our Supreme Court also reviewed the case law of other jurisdictions on the subject and stated: "We believe the best solution is that adopted by those states that vest the prerogative to request an alibi instruction in the sound discretion of trial counsel and analyze counsel's decision not to seek an alibi instruction under the full performance and prejudice test promulgated by the United States Supreme Court in *Strickland,* which is coextensive with our three-prong approach in *Pierce.*" *Hawkins, supra* at 732 n. 21.

Thus, in accordance with our Supreme Court's clear pronouncement in *Hawkins,* the PCRA court was, and this Court is, compelled to analyze the prejudice aspect of the ineffectiveness test in this context. The *Hawkins* Court clearly articulated that the prejudice element of the *Pierce/Strickland* test must be satisfied before a new trial can be awarded based on trial counsel's failure to request an alibi instruction. *See also Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 538 (2009) (counsel cannot be found *per se* ineffective under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), for failing to adequately investigate and interview alibi witnesses and before a defendant will be awarded a new trial, actual prejudice must be demonstrated based upon such failure).

In light of our Supreme Court's unequivocal rulings in *Hawkins* and *Johnson,* this

Court would be seriously remiss, and indeed face rebuke, if we failed to conduct an inquiry into whether Appellant was prejudiced by trial counsel's unexplained failure to seek an alibi instruction. *Commonwealth v. Randolph*, 553 Pa. 224, 718 A.2d 1242, 1245 (1998) ("We take this opportunity to admonish the Superior Court that it is obligated to apply and not evade our decisions. It is a fundamental precept of our judicial system that a lower tribunal may not disregard the standards articulated by a higher court."); *see also Commonwealth v. Shaffer*, 557 Pa. 453, 734 A.2d 840, 844 n. 6 (1999) (same). In accordance with the directives of *Hawkins*, we must analyze the prejudice issue.

■ We now address Appellant's contention that the PCRA court improperly determined that he was not prejudiced by the lack of an alibi instruction. In that connection, we examine the evidence adduced at Appellant's trial. Dr. Halbert Fillinger performed the autopsy and concluded that Mr. Webb died of a single bullet that entered the rear of his head while he was standing. The bullet stopped in the forehead, and there was no exit wound. Jim Webb died between 7:00 p.m. and midnight on December 26, 1996.

The following evidence pertaining to motive was introduced. The Inn was purchased on November 17, 1995, for $1,286,000, of which $1,140,000 was financed. Mr. Webb was the executive chef at the restaurant while Appellant was the *sous* chef, handling side dishes and appetizers. At the time of the Inn's purchase, life insurance on Jim Webb's life in the amount of $650,000 was obtained for Appellant's benefit and *vice versa*. After Mr. Webb died, $433,303 of the life insurance proceeds went to satisfy a loan owed by the Inn to the Small Business Association, and the remaining funds went into escrow

in connection with bankruptcy proceedings for the Inn filed after Mr. Webb's death.

The Commonwealth presented Richard Zayas as an expert in the area of forensic accounting. Mr. Zayas reviewed the financial condition of the Inn, a corporation equally owned by Appellant and Mr. Webb, and he established the following. The restaurant opened in December 1995, was not profitable, and would not have been able to continue to operate through 1997. There were three loans secured by restaurant assets, sales were decreasing, and it was unlikely that the Inn would have received the cash infusion critical to its survival. Mr. Zayas opined that the Inn was insolvent at the time of the murder.

Appellant's father, Guy Sileo, had contributed $100,000 in connection with the purchase of the Inn. In a letter to one of the Inn's creditors, Mr. Sileo represented that the $100,000 was a gift. As the Inn began to fail and Mr. Webb articulated his desire to open another restaurant without Appellant, Appellant began to insistently demand that Mr. Webb and his wife sign a document acknowledging that the $100,000 from Appellant's father was a loan rather than a gift. The Webbs refused to sign that document. After the murder, Appellant, in his capacity as owner of the Inn, entered a stipulation that the $100,000 from his father was a loan rather than a gift. After this stipulation was entered, Appellant's father became a creditor of the corporation and thus, eligible to receive part of the $215,000 in life insurance proceeds that were paid into the bankruptcy proceeding.

By December 1996, Mr. Webb began to act on his plan to leave the Inn and start his own restaurant. Mr. Webb was dissatisfied with Appellant's performance, believed that Appellant drank excessively, and was upset about Appellant's extramar-

ital affairs. John L., who sold advertising for the Inn, said that Mr. Webb told him that "he was going to terminate the relationship [with Appellant] and leave the restaurant after New Year's." N.T. Trial, 7/26/01, at 122. John L. opined that Mr. Webb would have been successful in that endeavor because his "talent was renown. He had an innate talent." *Id.* at 125.

Robin Webb, Mr. Webb's wife, confirmed that at the time of the murder, Appellant and her husband were "not getting along." *Id.* at 141. Every month, the Inn was getting deeper in debt while Appellant was drinking, openly engaged in an extramarital affair with Inn-employee Felicia M., and was not performing his duties with respect to the restaurant. In the weeks leading up to the murder, Appellant and the victim were "[a]rguing, shouting. Sometimes it was physical. Sometimes there [were] days that they wouldn't speak to each other." *Id.* at 142.

On November 9, 1996, Appellant and Mr. Webb got into a fistfight in an office on the third floor of the restaurant, and Mrs. Webb managed to stop the altercation. After the fight ceased, Mr. Webb left the office momentarily and, when he returned, Mr. Webb was upset and distressed. He told his wife, "[Appellant's] got that gun, the unregistered one." *Id.* at 155. After the fistfight, Mr. Webb started taking steps to dissolve the business.

On December 19, 1996, Mr. Webb visited the Inn's corporate attorney, William W. William W. confirmed that Mr. Webb was very upset and told William W. that he needed "to get out of the business. I want out of the General Wayne." *Id.* at 214. Mr. Webb explained to William W. that he was working too hard and that Appellant was "not pulling his weight. [Appellant] is drinking too much. And [Appellant] is having a relationship with one employee." *Id.*

We now examine the evidence relating to the events that occurred during and after the discovery of Mr. Webb's body. The Inn consisted of three floors, and the victim was found in his third-floor office. Betty C., the pastry chef, arrived for work at the Inn at 7:50 a.m. on December 27, 1996. Mr. Webb's truck was located in the parking lot, and the Inn's front door was unlocked. Betty C. called for the victim, received no reply, and started to bake. Appellant arrived at approximately 9:20 a.m., appeared upset, and informed Betty C. that he and his wife were separating.

After Betty C. told Appellant that she had not been able to locate Mr. Webb, Appellant went upstairs, and he returned, saying, "Jim is dead on the office floor upstairs. We have to call police." N.T. Trial, 7/25/01, at 72. Appellant then said, referring to the people purportedly responsible for the death, "[T]hose dirty bastards," and "[T]hose lousy bastards." *Id.*

Betty C. went to the third floor. The victim was lying on his back on the carpet next to his desk. He had no visible wounds, and there was dried blood in his nose and coming from his mouth. Betty C. testified that Mr. Webb appeared to have died by falling and hitting his head. She related, "I did not see any wound, any reasons that something else had killed him." *Id.* at 85. Betty C. also told the jury that she twice heard Appellant, who openly owned a gun, say, "I really feel like I need to shoot someone." *Id.* at 90–91.

Betty C. continued that Mr. Webb was the executive chef of the Inn and the driving force behind its operation. She also confirmed that Mr. Webb was "very concerned about the amount of drinking that [Appellant] was doing. [The victim] felt because of it, [Appellant] was not able to work as much as he could and was not holding up his end of the whole deal that

they had made with running the restaurant." *Id.* at 87. Finally, Betty C. stated that the decedent also was upset about Appellant's relationship with Felicia M. Mr. Webb was afraid that if something happened in the relationship, Felicia M. would file a sexual harassment lawsuit against the restaurant. Mr. Webb told Betty C. that if something happened with the Inn, he would start another restaurant without Appellant.

Lower Merion Township Police Officer Thomas Bowman, together with trainee Police Officer Christopher Arriviello, responded to the call about an unresponsive person at the Inn, and they arrived at approximately 9:35 a.m. on December 27, 1996. Officer Bowman was the first police officer to inspect the body. Like Betty C., Officer Bowman saw no evidence of wounds or indication that Mr. Webb had been shot. Officer Bowman did see an injury to Mr. Webb's forehead, and as did Betty C., he believed that the victim died after falling and hitting his head. He left the body in place and called his sergeant.

Officer Arriviello related that when he arrived at the Inn at 9:35 a.m., he spoke with Appellant, who informed Officer Arriviello that his partner was dead. When Officer Arriviello asked what had occurred, Appellant responded, "He was killed. . . . For the money, the money. . . . It must have been for the money." *Id.* at 143.

Lower Merion Detective Sergeant John Stillwagon arrived at the Inn around 10:00 a.m. After he viewed Mr. Webb's body, he came to the same conclusion about the manner of death as Betty C. and Officer Bowman. There was no reason to conclude that the victim had been killed. Sergeant Stillwagon saw a lump on the victim's forehead, which indicated to him that Mr. Webb hit his head on a counter next to the body and died as a result of a fall.

After Sergeant Stillwagon viewed the murder scene, he went downstairs and asked Appellant when he last saw Mr. Webb alive. Appellant responded that he saw the decedent alive at 10:00 p.m. on December 26, 1996. Appellant related that at that time, he and Felicia M. left the Inn with Jim Webb inside. Appellant and Felicia M., who died in February 1997, were the last people to see Mr. Webb alive.

After Appellant admitted to Officer Arriviello that he was aware that Mr. Webb had been murdered, police discovered that this information was true. Specifically, a bullet wound was discovered in the back of the decedent's head. At that time, there were six police officers present in the room. All six police officers decided to keep confidential the fact that Mr. Webb had been shot.

Thus, when Mr. Webb's family arrived at the Inn after 10:00 a.m. on December 27, 1996, no one had viewed the bullet wound other than the six police officers sworn to secrecy. Sergeant Stillwagon went to tell the family about his death. At that time, Appellant approached Mrs. Webb, and Appellant said, "Jim's been shot." *Id.* at 171. Sergeant Stillwagon was "surprised at the statement wondering how [Appellant] knew that" Mr. Webb had been shot. *Id.* Sergeant Stillwagon emphasized that the six police officers who were in the room when the bullet hole was discovered "consciously kept that information to the people that were in the room." *Id.* at 172. After Appellant made this statement to Mrs. Webb, Sergeant Stillwagon specifically ascertained from the other five police officers who were present when the wound was found that they had not told Appellant that Mr. Webb was shot.

Lower Merion Police Detective George Metz accompanied Sergeant Stillwagon to

inform Mr. Webb's family about the death. He also heard Appellant tell Robin Webb that "Jim had been shot." *Id.* at 210. Detective Metz became suspicious since at that time, only police were aware of that fact. The bullet's entry wound was to the back of the head, the victim was lying on his back, there was no blood on the floor, and police in the room at the time of its discovery agreed not to disclose that information to anyone.

Lower Merion Police Detective Michael Gilbert established the following. No wine was reported missing from the restaurant. The safe was locked, inventoried, and contained $7,106.22 in cash. The victim was wearing a watch and a gold chain, and his wallet, which contained $515 in cash, was in his pants pocket. Police recovered a .25 caliber Winchester bullet casing, which is also known as a cartridge, in the office with the body. Sergeant Stillwagon established that there was no evidence of a forced entry at the Inn and confirmed that there was no indication that anything had been taken from the establishment.

Lower Merion Police Detective Timothy Woodward was involved in the investigation into Mr. Webb's death. Detective Metz informed Detective Woodward that Appellant told Mrs. Webb that her husband had been shot so Detective Woodward confirmed with all six police officers who were present when the bullet hole was discovered that they had not told anyone about it.

Detective Woodward interviewed Appellant on December 27, 1996. Appellant reported to Detective Woodward that the following occurred. He and his girlfriend, Felicia M., left Jim Webb alone at the Inn at 10:00 p.m. on December 26, 1996. Felicia M. had car trouble, and after Appellant restarted her car, Felicia M. drove away and went to her girlfriend's house. After Appellant started Felicia M.'s car, he re-entered his car and went to a local establishment called Mulligan's Bar. After drinking there, Appellant went home and then called Felicia M. from his car and told her that he was going to leave his wife and asked Felicia M. to wish him luck. Police obtained copies of Appellant's cell phone records, which established that the call to Felicia M. was placed at 11:29 p.m. on December 26, 1996.

Commonwealth witness Michelle P. indicated that she went to dinner with Felicia M., Appellant, and another employee of the Inn on December 27, 1996, the day following the murder. During dinner, Appellant told his companions that police thought that Mr. Webb died in a robbery and that expensive wine was missing from the restaurant.

Extensive evidence was presented as to Appellant's ownership of the unregistered gun mentioned by Jim Webb after the fistfight as well as Appellant's unsuccessful attempt to hide his ownership of that weapon from police. Police executed a warrant at Appellant's home on December 28, 1996, and recovered a .38 caliber Taurus pistol and a .25 caliber Phoenix Arms semi-automatic pistol, which was not the murder weapon, in a Galco holster. Appellant purchased the .25 Phoenix Arms handgun on December 2, 1996, just weeks prior to the murder. Detective Woodward interviewed Appellant again on December 31, 1996, when Appellant affirmatively represented to Detective Woodward that the .25 caliber Phoenix Arms was the only .25 caliber weapon that he had ever owned.

Appellant was called to testify in front of the grand jury convened to investigate Mr. Webb's death and was asked whether he had ever possessed a .25 caliber pistol other than the Phoenix Arms pistol that police seized from his home. He answered that question negatively. In an April 1997 consensual wiretap performed by police,

Appellant admitted to a former employee that he had owned a different .25 caliber weapon. Appellant was charged with and convicted of perjury in connection with his statement before the investigating grand jury.

Commonwealth witness Joseph C. knew Appellant and the victim when they owned a restaurant called American Bistro Inn. Two weeks before the Inn opened, Appellant showed Joseph C. a .25 caliber handgun that Appellant owned. Joseph C. saw markings on that weapon that indicated that it was made in Gardo, Italy, by a manufacturer whose name started with the letter B. The witness testified that Beretta makes guns in Gardo, Italy.

Michelle P. also provided evidence on the subject. She said that in November 1996, Appellant and Felicia M. became lovers, and they used Michelle P.'s apartment for trysts. Michelle P. observed Appellant in possession of two guns at her apartment on November 16, 1996. She testified that one was in a holster on Appellant's body and that there was another, smaller gun.

In December 1996, Christopher S. was the bartender at Mulligan's Bar, which he referred to as Mulligan's Grill. He was well acquainted with Appellant, Felicia M., and Mr. Webb because they frequented the bar. At the end of October 1996, Appellant was at the bar when he informed Christopher S. that he had two weapons, a large gun in a shoulder holster and a smaller .25 caliber weapon that he kept in the back of the holster. Christopher S. also established that sometime in November 1996, Appellant was speaking with Christopher S. about extradition and said, "Chris, do you know of countries that we don't have any extradition treaties with, like if you wanted to—where—somewhere you could hide-out if you wanted to kill somebody." N.T. Trial, 7/27/01, at 6.

The Commonwealth presented a significant amount of evidence establishing that bullets found in Appellant's .25 caliber Phoenix Arms handgun came from a partially-filled box of ammunition discovered in a room next to Jim Webb's body and that the bullet used to kill Mr. Webb was from that same box. Montgomery County Detective Leon Krebbs was certified as an expert in firearms and tool mark identification, and he established the following. Each type of gun produces different marks on a bullet as the bullet passes through the barrel of the gun. The bullet removed from Jim Webb's skull was a Winchester brand bullet, caliber .25 automatic, and in very good condition. It was not fired from the Phoenix Arms handgun recovered from Appellant's home but could have been fired from a Beretta .25 caliber handgun. Police recovered bullets from Appellant's Phoenix Arms weapon and also discovered a partially-filled box of bullets in the room next to Mr. Webb's body. The bullet that killed the victim, the bullets in Appellant's Phoenix Arms handgun, and the bullets remaining in the box recovered in the room at the Inn were "Winchester brand, caliber .25 automatic. All of [the bullets] had full metal jacket, meaning that the bullet was completely encased in copper, with the exception of the base." N.T. Trial, 7/27/01, at 113.

Special Agent Paul Tangren of the Federal Bureau of Investigation was also qualified as an expert in firearms and tool mark examination. Through other witnesses, the Commonwealth had established that Appellant's Phoenix Arms weapon was stored in a Galco holster, which also was seized by police. Agent Tangren established the following. A bullet is manufactured in a cartridge, which is a casing around the bullet. The cartridge has a base, where the bullet is struck when it is fired. After being struck, the bullet is the projectile that is propelled through the

gun barrel, and in a semi-automatic gun, the cartridge is ejected from the gun after the bullet is fired. When a bullet is manufactured, a headstamp is placed on the base of the cartridge by a tool called a bunter. Bunters wear out, and each one has unique, microscopic flaws that produce slight discrepancies. These flaws render it possible to ascertain if a bullet's headstamp was produced by the same bunter as another bullet.

Agent Tangren analyzed the cartridges from the partially-full box of Winchester bullets from the Inn, the cartridges taken from Appellant's Phoenix Arms gun, and the cartridge found in the room when Mr. Webb's body was discovered. All the cartridges that he examined had Winchester headstamps, and the identical bunter produced each one of those headstamps.

Agent Tangren also analyzed the holster holding the Phoenix Arms gun. When a gun is placed in a holster, it leaves marks, impressions, and abrasions inside the holster. The holster from Appellant's house had tool marks consistent with the Phoenix Arms gun located inside it as well as tool marks inconsistent with that weapon but consistent with a .25 caliber Beretta pistol having been placed therein. The markings on the holster indicated that there was prolonged or repeated contact between the holster and the Beretta.

The Commonwealth also produced expert Charles Peter, who worked for the FBI. He conducted comparative bullet lead analyses on the bullets found in Appellant's Phoenix Arms gun, bullets in the ammunition box found in the room next to Mr. Webb's office, and the bullet that killed the victim. Mr. Peter related that bullet lead is produced in a kettle and that every kettle of lead, which consists of about one ton, has its own distinct composition of metals. The chemical composition of all the bullets he examined were indistinguishable.

Finally, the following Commonwealth evidence was presented as to Appellant's whereabouts on the night of the murder. As noted, Appellant told police that he left the Inn at 10:00 p.m. with Felicia M. and went to Mulligan's Bar while Felicia M. first went to a friend's house and then rendezvoused with him at the bar later. Michelle P. provided testimony relevant to Appellant's alibi. She stated that on December 26, 1996, she arrived at her home between 10:00 p.m. and 10:15 p.m., and Felicia M. was present and using the bathroom. Michelle P. said that it took fifteen minutes to reach her home from the Inn.

Christopher S., the bartender at Mulligan's Bar on the night in question, specifically recalled that Appellant entered the establishment on the night of December 26, 1996, sometime between 10:30 p.m. and 10:45 p.m. Christopher S. was able to offer this evidence because he looked at a clock when Appellant arrived that evening. N.T. Trial, 7/26/01, at 8. Appellant appeared "harried, nervous and sweaty." *Id.* Appellant told Christopher S. that he was leaving his wife for Felicia M., who arrived twenty to thirty minutes after Appellant. Christopher S. related that Felicia M. and Appellant left Mulligan's Bar after 11:00 p.m.

Appellant's testimony, which the prior PCRA panel construed as an alibi, was as follows. The restaurant closed at 8:30 p.m. and at around 9:30 p.m., Felicia M. took some employees to the bus stop in Appellant's Jeep and returned to the Inn. When Felicia M. returned, she, Appellant, and Jim Webb were the only people remaining at the Inn. They agreed to meet at Mulligan's Bar. The victim stayed behind to do some work, locked the door with Appellant's keys, and returned those keys

to Appellant. Appellant and Felicia M. left the Inn at 10:00 p.m.

Appellant drove Felicia M. to her car, which took one or two minutes. Felicia M. started to drive to a nearby bank, but her car stalled and she coasted into a parking lot located directly across the street from the Inn. Appellant had followed Felicia M. and looked down the street to see if a nearby gas station was open but the lights were extinguished. Appellant restarted Felicia M.'s car himself. Appellant said that the car stalled about five minutes after they left the Inn, and he started the car about one minute later. Appellant told the jury that it took eighteen minutes to reach Mulligan's Bar from the Inn and he arrived there at 10:20 or 10:25 p.m., at the latest.

We now compare Appellant's timeframe with that established by Michelle P. and Christopher S., who were disinterested witnesses. Michelle P.'s testimony was that on December 26, 1996, she arrived at her home between 10:00 p.m. and 10:15 p.m., and Felicia M. was already present and using the bathroom. Michelle P. said that it took fifteen minutes to reach her home from the Inn so, according to Michelle P.'s testimony, Felicia M. must have left the parking lot located across the street from the Inn by 10:00 p.m. at the latest because she was already present and using Michelle P.'s bathroom when Michelle P. arrived home by 10:15 p.m., which was the latest possible time that Michelle P. came home. Then, Christopher S., the bartender at Mulligan's Bar, testified specifically that Appellant did not arrive at that establishment until after 10:30 p.m. Christopher S. stated that he remembered "checking out a clock" when Appellant came into Mulligan's Bar on December 26, 1996, and that Appellant arrived "[s]ometime after 10:30" p.m., between 10:30 and 10:45 p.m. N.T. Trial,

7/27/01, at 8. He said that it was probably 10:35 p.m.

Thus, Michelle P. established that Felicia M. drove away, leaving Appellant alone across the street from the Inn sometime between 9:45 p.m. and 10:00 p.m. Meanwhile, Christopher S. proved that Appellant did not arrive at Mulligan's Bar until after 10:30 p.m. Appellant said that it was an eighteen-minute drive to Mulligan's Bar from the Inn. Thus, these two completely independent witnesses directly refuted Appellant's timeline and established that Appellant was alone at the Inn by 10:00 p.m. at the latest and did not leave until 10:17 p.m. Appellant had a gun and the keys to the Inn in his possession and was across the street from the murder scene. Appellant had between seventeen minutes and thirty-two minutes alone at the crime scene.

Felicia M. gave police two statement, which have been characterized as supporting Appellant's alibi evidence. In a December 27, 1996 statement taken by Sergeant Stillwagon and Detective Metz, Felicia M. said she and Mr. Webb left the Inn at "[a]pproximately, 10:00 o'clock" and planned to go to Mulligan's Bar with Mr. Webb, who said that he would arrive shortly. N.T. Trial, 7/26/01, at 248. Felicia M. told police that after she left the Inn, "I had trouble with my car. And when I got it started, we drove to Mulligan's. I drove in my car and [Appellant] in his jeep." *Id.* at 249. Felicia M. reported that she and Appellant stayed at Mulligan's Bar until 11:30 p.m. or 12:00 a.m., when Appellant left after informing her that he was going home to tell his wife he was separating from her.

Lower Merion Detective Charles J. Craig, Jr. took a statement from Felicia M. on December 28, 1996. In this statement, Felicia M. stated that the following occurred on the evening of December 26,

1996. Business was slow and the restaurant closed at 8:30 p.m. Three other employees and Felicia M. cleaned the establishment, finishing "around 9:30 p.m. or so." *Id.* at 251. Appellant took the cash drawer to the office, one employee left, and Felicia M. took the other two employees to the bus stop in Appellant's Jeep. When she returned, Appellant and Mr. Webb were at the bar.

Felicia M. continued that after arranging to meet Mr. Webb at Mulligan's Bar, she and Appellant then entered his Jeep and drove to a parking lot close to the restaurant, where Felicia M.'s car was located. She entered her car and tried to drive to a bank near the Inn, when her car stalled. Appellant was following her, went to the gas station down the street to see if it was open, and then returned. He started her car, and Felicia M. decided not to use the bank and drove away while Appellant remained behind near to the Inn in his Jeep.

However, in the December 28, 1996 statement, Felicia M. did not say that she went to Mulligan's Bar after leaving the Inn. Rather, Felicia M. indicated that she went to Michelle P.'s home before going to Mulligan's Bar. On December 28, 1996, Felicia M. did not tell police that she stayed at the bar between one hour and one and one-half hours. Instead, she said that she was there for one-half hour and went home. While the first statement made no mention of a telephone call, in the second one, Felicia M. said that after she was home, Appellant called from his cell phone and told her that he was going into his house and to wish him luck.

In upholding the propriety of the PCRA court's finding that there was no prejudice flowing from Appellant's failure to receive an alibi instruction, we rely upon the following. The evidence of Appellant's guilt was overwhelming. On the morning of December 27, 1996, Appellant knew that Jim Webb was shot even though the body had no visible bullet wounds and the man appeared to have died from a fall. The Commonwealth firmly established that robbery was not a motive for the murder while Appellant had a personal and financial motive to kill Jim Webb. There was open hostility between the two men due to Appellant's improper activities, and the victim had started to implement plans to open another restaurant without Appellant. Additionally, the Inn was failing, and a life insurance policy on Mr. Webb's life decreased corporate debts by $650,000. Due to Appellant's declaration that $100,000 received from his father was a debt, Appellant's father stood to gain from the life insurance proceeds.

The victim was killed with a .25 caliber gun. The Commonwealth proved that Appellant owned an unlicensed .25 caliber Berretta weapon that he kept in his holster before he purchased another .25 caliber semiautomatic weapon manufactured by Phoenix Arms. The Phoenix Arms gun was purchased three weeks before the murder. Appellant lied about possessing the Berretta to an investigating grand jury. The Commonwealth established that Appellant's Phoenix Arms handgun was loaded with bullets from a box of bullets contained in a room next to the decedent's office and that a bullet from that box was used to murder Jim Webb.

Appellant twice stated in front of Betty C. that he wanted to kill someone and asked Christopher S. about foreign countries that do not extradite for murder. Jim Webb had to have been killed between 9:45 p.m., when Appellant and Felicia M. last saw him alive, and midnight, the latest possible time of death given by the coroner. Evidence from disinterested witnesses placed Appellant alone at the scene of the crime scene from approximately 9:45 p.m.

to 10:20 p.m. The day after the murder, Appellant falsely told other people that police thought that Mr. Webb was killed in a robbery and that expensive wine was missing.

Felicia M.'s statements did not provide support for Appellant's position as to the precise time that he was left alone in the parking lot across from the Inn. First, she gave police two conflicting statements as to where she went after she left the Inn on December 26, 1996—saying that she went straight to Mulligan's Bar in the first one and then indicating that she first went to a friend's house and then to the bar. Additionally, in both statements, Felicia M. was imprecise about the timeframe of the key events. She gave approximations as to when she and Appellant left the Inn and failed to give a single detail about how long it took for her to get to her car, the car to stall, and Appellant to restart it. Finally, she was romantically involved with Appellant and had a motive to aid him.

In light of the overwhelming evidence produced by the Commonwealth and Appellant's perjury conviction, which severely undercut his credibility, we cannot conclude that the PCRA court committed an abuse of discretion in finding that Appellant was not prejudiced by the absence of an alibi instruction. Indeed, the record fully sustains its finding in that respect.

As our Supreme Court observed in *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282 (2010), a defendant has not suffered prejudice from a counsel's purportedly deficient performance unless there is reasonable probability that the verdict would have been different, and the probability must be sufficient to undermine confidence in the outcome of the proceedings. In this case, there is no reasonable probability sufficient to undermine confidence in the verdict that trial counsel's failure to re-

quest an alibi instruction would have altered the outcome of Appellant's trial.

■■ We also make the following observation. An alibi is a defense that places a defendant at the relevant time at a different place than the crime scene and sufficiently removed from that location such that it was impossible for him to be the perpetrator. *Commonwealth v. Collins*, 549 Pa. 593, 702 A.2d 540 (1997). Where a defense rests on timing rather than location, it is not considered an alibi. *Id.* Appellant herein, by his own admission, was alone, directly across the street from the murder scene, during the period of the killing.

There remains a final analysis. As noted, on direct appeal, Appellant was granted review of a claim of ineffective assistance of trial counsel based upon the *Bomar* exception to the *Grant* rule. This procedural posture cannot be ignored, and given that he already has enjoyed review of some claims of trial counsel's ineffectiveness, Appellant now must establish both ineffective assistance of trial counsel and ineffective assistance of appellate counsel in failing to litigate trial counsel's ineffectiveness for not seeking an alibi instruction. *See Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431 (2011); *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003). Herein, direct appeal counsel litigated these issues on appeal:

I. The trial court erred in denying Sileo's ineffective assistance of trial counsel claim.

II. The trial court erred when it allowed into evidence under the hearsay exception for excited utterance James Webb's statement, after an altercation with [appellant], that "Guy's got that gun, the unregistered one."

III.   The trial court improperly allowed into evidence wholly speculative expert witness testimony concerning the likely height of the perpetrator.

IV, The trial court jury instructions concerning the effect of Sileo's perjury conviction were hopelessly in conflict and prejudicial, necessitating a new trial.

V.   The trial court should have granted a new trial based on the prosecution's repeated improper expressions of personal belief during closing argument in the [appellant's] guilt and lack of credibility and veracity.

VI.   The trial court violated the [appellant's] right to a public trial by conducting individual voir dire privately.

*Commonwealth v. Sileo,* 837 A.2d 1181, 1181 (Pa.Super.2003).   It cannot be rationally accepted that appellate counsel was ineffective for failing to litigate the weak alibi issue on direct appeal and instead, focusing on the other issues raised.

We thus conclude both that the PCRA court *did not commit an error of law in* considering the prejudice aspect of Appellant's ineffectiveness claim and that the record supports the PCRA court's finding that Appellant was not prejudiced due to trial counsel's neglect to ask for an alibi instruction.   Hence, *we must affirm.*

Order affirmed.